WILLIAM D. HENDRICKS, SCOTTIE A. FOSTER (nee, HENDRICKS), SARAH J. BOWEN (nee, HENDRICKS), MARY E. HENDRICKS and HARVEY A. HENDRICKS v. WILLIAM J., MARY J. and JOSEPHUS CALLOWAY, W. F. McDANIEL and STEPHEN McPHERSON, Appellants.

Division One, April 13, 1908.

1. **BILL OF EXCEPTIONS: Motion for New Trial: Skeleton Call for Same.** Where the bill of exceptions calls on the clerk to copy the motion for a new trial, and then recites that the motion was overruled, to which ruling appellant saved an exception, and the abstract, though inartificially arranged, contains enough to show that said recital is a part of the bill of exceptions, it cannot be said that no exception was saved to the overruling of the motion for a new trial.

2. ———: ———: ———: **Abstract.** The fact that the motions for a new trial and in arrest were not copied into the bill of exceptions at the places in the bill at which there were calls on the clerk to copy them, will not authorize a ruling that there is no bill of exceptions before the appellate court. But if in such case the motions are copied in full in the record, though they do not appear bodily in that part of the abstract designated as the bill of exceptions, and the bill itself shows that exceptions were saved to the overruling of them, they will be held sufficient, as will the bill and abstract, under the Act of 1903, Laws 1903, p. 105.

3. **PLEADING: Misjoinder: Multifariousness: Demurrer.** By refusing to stand on their demurrer and by answering over, defendants waived all questions relating to misjoinder of separate causes of action in the bill, and of multifariousness in the pleading.

4. ———: **New Defendants: After Change of Venue: Jurisdiction.** After a change of venue, plaintiffs amended their bill by bringing in new defendants, and the answer of such defendants denies "that this court has any jurisdiction of this action as to defendants here answering, and they ask that the same be dismissed." *Held*, that, as the answer makes no allegations of facts showing lack of jurisdiction, but is a denial of an imaginary allegation in the petition, and as if it be allowed as an affirmative allegation then it is open to the objection that it pleads a mere conclusion, the point that the court was with-

out jurisdiction because the defendants were brought in after change of venue, cannot be considered.

5. ———: ———: ———: ———: How Raised. If facts showing a lack of jurisdiction appear in the petition, the objection should be raised by demurrer. If they do not appear in the petition, they should appear in the answer.

6. ———: Contradictory and Self-Destroying Allegations: Alternative. Although the pleading does not with precision obey the statutory admonition relating to pleading in the alternative, it will not be held that a petition, which in one count charges that a certain deed of trust was a forgery, and in another assumes that it is valid but charges that its foreclosure and the trustee's deed consummating the foreclosure were void because of acts preceding and attending the sale, is self-destructive, if a liberal construction shows that the pleader was relying on two theories, one of which might be false, and the other true, and if either was true there was equity in the bill.

7. DEPOSITION: Competency. A deposition cannot be read against one not a party to the suit at the time it was taken. So that the deposition of certain defendants taken before others were made defendants cannot, over objection, be read against the later defendants brought in by amended petition and summons. As to such later defendants there is no suit pending. But if the chancellor in his final decree made a finding to the effect that the deposition was admissible only against those defendants who were such at the time it was taken, it cannot be said that the original error in overruling the motion to suppress the deposition materially affected the merits of the case.

8. ———: Motion to Suppress: How Preserved: By Calls. A motion to suppress the deposition may be preserved for appeal by incorporating a call on the clerk in the bill of exceptions to copy the motion, the ruling of the court thereon, an exception to its ruling, and by setting forth the motion elsewhere in the record supplied to the appellate court The Act of 1903 provides that any motion properly identified and deposited with the clerk need not be copied in the bill of exceptions, provided the bill contains a direction to the clerk to copy the same, and the same is copied into the record sent up.

9. INNOCENT PURCHASER: Descent Cast: Secret Notice of Fraud. An innocent purchaser for value by warranty deed takes the title to real estate discharged of secret outstanding equities and trusts not of record, and having a good title himself he can transfer one to a grantee who had notice, and of course a good title descends to his heirs. So that where William bought land at a foreclosure sale of a deed of trust, and af-

terwards sold it by warranty deed to his father David, and on David's death it descended to William and his mother and sister as David's heirs at law, if David was an innocent purchaser, such heirs, including William, took the title, and no infirmities in William's title prior to his deed to David need be considered.

10. ———: ———: **Fraud: Notice: Lack of Proof.** Where defendants' deceased ancestor had bought the land long after foreclosure sale and purchase by his son and the record of his deed, and the petition alleges notice to such ancestor of the son's fraud in the foreclosure proceeding and participation in his fraud, while the answer denied the fraud, denied notice to the ancestor and pleaded his good faith, and plaintiffs introduced no proof tending to show notice, while the defendants introduced as much proof sustaining their averment as the nature of the case made possible, the ancestor's warranty deed from his son cannot be set aside on the ground that he had notice of his son's fraud, if there was fraud.

11. ———: **Quitclaim Deed: Notice.** A grantee who holds under a quit-claim deed is not such an innocent purchaser as will defeat existing outstanding trusts and equities not the subject of record under the Registry Act. A quit-claim deed does not bar outstanding equities not the subject of record. So that if the purchaser at the foreclosure sale under a deed of trust was guilty of such acts antedating and attending the sale as made his title fraudulent as to plaintiffs, his grantee in a quit-claim deed takes the title subject to plaintiffs' equities.

12. **FRAUD: Deed of Trust: Sale: Combination to Depress Bidding.** It is elementary equitable doctrine that a combination to suppress or chill bidding at a foreclosure sale under a deed of trust leaves the land subject to redemption by the non-participating owners of the equity of redemption as against a purchaser who is a party to the combination put into operation.

13. ———: ———: ———: ———: **By Purchaser and Life Tenant Against Remaindermen.** Plaintiffs' mother was the owner of three tracts of land, and she and her husband joined in a deed of trust to secure a debt which at the time of the sale amounted to $1,265. She died, leaving the plaintiffs as her children, and her husband and a defendant, who acted out of a friendly and neighborly interest for the husband, joined in an agreement by which two of the tracts were to be sold to said defendant for $1,600, and in order to make title that the property was to be sold under the deed of trust. The three tracts were sold at foreclosure sale to said defendant, and he paid the mortgage debt and paid to the husband the balance between the debts and costs and the $1,600, and sold the two tracts by warranty

deed to his father who took without notice, and the third tract he sold by quit-claim deed to another defendant for $550, and the money was paid to the husband. It was not necessary to sell the third tract to pay the mortgage debt, and it was agreed that the husband, whether he or the said purchaser bid it in, was to be the beneficial owner, and the purpose of selling it was that the children's interest as remaindermen in the equity of redemption should be cut away, and that the husband might have the title. *Held*, that the sale of the third tract was fraudulent as to the children, and as other defendants derive title by quitclaim deeds from the purchaser, the sale as to that tract should be set aside and the title vested in the children, unless barred by limitation, subject to the husband's curtesy.

14. LIMITATIONS: Beginning of Suit As Bar: Nonsuit. Where the owners of the equity of redemption brought a suit, within the statutory period of limitation, to clear away the cloud of a deed of trust and a foreclosure sale, on the theory that the deed of trust was a forgery, and suffered nonsuit, and within a year, but not within ten years after adverse possession had begun by the grantee in a recorded quitclaim deed, brought another suit in which for the first time they asserted claim of title based on the theory that the deed of trust might be valid but its foreclosure was void, their last suit as to those of them not under legal disabilities is barred. The two suits were not the same cause of action, and the first did not stop the running of the Statute of Limitations as to the second.

Appeal from Schuyler Circuit Court.—*Hon. N. M. Shelton*, Judge.

REVERSED AND REMANDED (*with directions*).

*E. R. Bartlett* for appellants.

(1) Defendants' objection to the introduction of evidence should have been sustained. The petition was self-contradictory, as to first count. The second count failed to state a cause of action—showed misjoinder of five different actions without mutuality of parties, subject-matter or remedy. Such defects were properly raised by objection to evidence. Murphy v. Ins. Co., 78 Mo. App. 79; Malone v. Fidelity & Casualty Co., 71 Mo. App. 1; Jones v. Philadelphia Und's, 78 Mo. App. 296; Boggers v. Boggers, 127 Mo. 305; Staples v. Shackle-

ford, 150 Mo. 471; Rothschild v. Lynch, 76 Mo. App. 339. (2) The depositions of Hendricks, Calloway and McDaniels should have been excluded, as to McPherson, and the heirs of David Calloway, being taken before they were parties to the action. And the court's statement in the decree that they were not admissible against these defendants does not cure the error in their admission, when it is apparent that data in such depositions form the basis of such decree. Larrimore v. Bobb, 144 Mo. 446; Case Plow Works v. Ross, 74 Mo. App. 437; Perry v. Moon, 34 Mo. 286. (3)˙ The demurrer to evidence offered at close of plaintiffs' testimony, by Mary J. and Josephus Calloway and McPherson, should have been sustained. The evidence, undisputed, showed David Calloway a bona-fide purchaser for value, without notice of fraud, on a perfect record title, from a party in possession; hence, he took title free from all infirmities, not appearing of record, if any such existed, even though the original purchaser at the trustee's sale may have bought with knowledge thereof. The heirs of David Calloway took his bona-fide title. So also were McPherson and McDaniel shown to be bona-fide purchasers for value, without notice, and through the same title. After the transfer to bona-fide holders, plaintiffs' right to redeem was lost. Lindenbower v. Bently, 86 Mo. 513; Hume v. Hopkins, 140 Mo. 165; sec. 7103, R. S. 1889; Rutherford v. Williams, 42 Mo. 18; Hicks v. Beadle, 98 Mo. App. 233; Dwyer v. Rohan, 99 Mo. App. 120; Loan & Trust Co. v. Brown, 157 Mo. 116; Smith v. Boyd, 162 Mo. 146. (4) The evidence failed to show any ground for setting aside the trustee's deed against any defendant, and especially against McDaniel, and the heirs of David Calloway, proven to be bona-fide holders.

*C. C. Fogle* and *Jerry M. Jeffries* for respondents.

(1) The court cannot consider appellants' bill of exceptions, for the reason that it does not contain in-

corporated therein the motion for a new trial. Berkley v. Kahes, 13 Mo. App. 502; McCullom v. Hedges, 20 Mo. App. 688; Story & Camp v. Ragsdale, 30 Mo. App. 196; Jefferson City v. Opel, 67 Mo. 394. This court cannot consider any defects in the record, for the reason the motion in arrest is not incorporated in the bill of exceptions. Authorities cited above. Also: Pracher v. Patrick, 53 Mo. 251; Marquies v. Clark, 64 Mo. 601. This court cannot consider any exceptions taken, for the reason there are no exceptions saved in the bill of exceptions to the overruling of the motion for a new trial. State v. Bennan, 164 Mo. 487; Hubbard v. Queensberry, 32 Mo. App. 459; State v. Reed, 154 Mo. 122; Roe v. Bank, 167 Mo. 406. (2) The motion to suppress the depositions cannot be considered by this court, because it is not incorporated in the bill of exceptions, and because it is not complained of as error in any motion for a new trial. Authorities cited in point 1, above. The court excluded the depositions of Hendricks, Calloway and McDaniel as to all defendants but them. Yet the depositions were competent as to all defendants, for the reason that an objection to them at the time they are offered in evidence comes too late. State ex rel. v. Dun, 60 Mo. 65; McQuillin, Pleading & Practice, sec. 559. The defendants claiming in privity, the depositions were competent and even a motion to suppress should have been overruled. Tindall v. Johnson, 4 Mo. 113; Allen v. Choteau, 102 Mo. 308. (3) Unless the petition totally fails to state a cause of action an objection to the introduction of evidence at the beginning of the trial should not be sustained. Jones v. Phil., 78 Mo. 296; Young v. Iron Co., 103 Mo. 324. Land conveyed in fraud and then title passed to different persons, they may all be joined as defendants in one action for they all have an interest in respect to the fraud. Bliss on Code Plead., sec. 110a; Donnivan v. Dunning, 69 Mo. 436; Bobb v. Bobb, 76 Mo. 419. (4) Hendricks, after his wife's death, had curtesy in her

land subject to the deed of trust. Tremmel v. Kleiboldt, 75 Mo. 255; McTigue v. McTigue, 116 Mo. 138; Bassett v. O'Brien, 149 Mo. 381; Casler v. Gray, 159 Mo. 588. There being a curtesy estate outstanding somewhere, owned at one time by W. F. Hendricks, who is still living, the Statute of Limitations could not commence to run against these plaintiffs until the determination of that estate. The remainderman cannot come into court to recover possession of the land before the life estate has terminated. Consequently neither the thirty-year statute nor any other statute of limitation begins to run until the life estate is lifted. Dyer v. Wittler, 89 Mo. 81; Hall v. French, 165 Mo. 430; Shumate v. Snyder, 140 Mo. 77; Smith v. Ins Co., 64 Mo. 330; Bradley v. Railroad, 91 Mo. 498; Brown v. Moore, 74 Mo. 635; Linden Real Estate Co. v. Lindell, 142 Mo. 61; Reed v. Painter, 145 Mo. 341. These plaintiffs may sue to have this cloud removed from their title or they may not sue. In either event the Statute of Limitations does not run against them as long as the curtesy interest is outstanding and the life tenant is living. Reed v. Low, 163 Mo. 519; Andrius v. Vreeland, 29 N. J. Eq. 394; Downing v. Hawthorne, 95 N. W. 801; Inge v. Murphy, 10 Ala. 885; Parker v. Chambers, 24 Ga. 518; Campbell v. Benjamin, 69 Ill. 344. (5) The mother of the plaintiffs having died and left the title in fee, subject to the husband's curtesy in her children, and all of it subject to mortgage, it was a fraud upon these plaintiffs for their father to contract and agree with the defendant, W. J. Calloway, that he should buy 80 acres of the land at $1,600 and pay their father $400 of the $1,600 and with the balance pay the mortgage debt and also buy in the forty acres in question at said foreclosure sale with the agreement that it should be deeded to their father without consideration. The whole purpose of the entire transaction was to defeat plaintiffs of their title to the lands in controversy and to place the whole surplus over and above the mortgage debt into the pos-

session and control of their father. This was the rankest kind of fraud. Dickson v. Kempinsky, 96 Mo. 252; Snell v. Harrison, 104 Mo. 158; Baldwin v. Whitcomb, 71 Mo. 651; Hoge v. Hubb, 94 Mo. 489. Collusion or fraud is seldom susceptible of positive proof. The chancellor has the right and it is his duty to consider the entire surroundings of the transactions, the relationship and conduct of the parties, and then make such reasonable inferences as all the facts warrant. New England Loan & Trust Co. v. Brown, 177 Mo. 412. It is not necessary that fraud be intended but is sufficient if the acts of defendants were such as to constitute fraud. Sheridan v. Nation, 159 Mo. 38; Orr v. McKee, 134 Mo. 78; Cassidy v. Wallace, 102 Mo. 575; Hall v. Goodnight, 138 Mo. 576; Clarkson v. Greely, 40 Mo. 114. Courts of equity have always recognized that still small voice of suggestion emanating as it will from continguous facts and surrounding circumstances pregnant with inferences in all cases where fraud is charged. Ins. Co. v. Smith, 117 Mo. 292; Major v. Bukley, 51 Mo. 227; Leavitt v. LaForce, 71 Mo. 353; Roan v. Winn, 93 Mo. 503. A sale of more land than was necessary will result in vitiating the sale. Kelsay v. Bank, 166 Mo. 1. c. 173; Lazarus v. Caesar, 157 Mo. 199. (6) The sale contract among defendants being unusual, is a fraud on its face. Baldwin v. Whitcomb, 71 Mo. 651; Dickson v. Kempinsky, 96 Mo. 252; Snell v. Harrison, 104 Mo. 158. One who claims to hold title acquired from an innocent purchaser has the burden of so establishing. Bank v. Stanley, 46 Mo. App. 440; Johnson v. McMurrey, 72 Mo. 282; Ins. Co. v. Smith, 117 Mo. 261.

LAMM, J.—This is the appeal of above defendants from a final decree in equity in a cause going from Scotland to Schuyler county on change of venue. There were other parties defendant (among them, William F. Hendricks) not appealing. Plaintiffs are the surviv-

ing children of said William F. Hendricks and one
Martha A. Hendricks, his wife, deceased.

The decree, *nisi*, vests the title of the Southwest
one-fourth of. the Northwest one-fourth of section 3
and the Southeast one-fourth of the Northeast one-
fourth of section 4 (hereinafter, for convenience, both
forties are called tract ''A'') and the Northwest one-
fourth of the Northwest one-fourth of section 5 (for
convenience, hereinafter called tract ''B'')—all in
township 64, range 11, in Scotland county—out of de-
fendants and into plaintiffs, subject to the life estate
of defendant Hendricks, said life estate being
an estate by curtesy found by the chancellor to
be now owned by his codefendants (the Calloways and
McDaniel), and subject further to the payment of
$125.30 found by the chancellor to be due defendant
William J. Calloway as redemption from two certain
deeds of trust.

To get at that result, the chancellor set aside a
trustee's deed to said William J. Calloway executed to
him as a successful bidder on foreclosure of one of said
deeds of trust. The deed of trust foreclosed was a first
lien. It was executed on tracts ''A'' and ''B'' on No-
vember 8th, 1886, by said Martha A. Hendricks and her
said husband. It secured a principal note of $1100 run-
ning five years at six per cent with semi-annual coupons
attached, and, as it will be mentioned frequently in this
opinion, for convenience it will be called ''C.'' The
other deed of trust bore the same date, covered the
same property, was executed by the same parties and
secured a note of $110 running two years. To get at
said result the chancellor also set aside a subsequent
warranty deed made by defendant William J. Calloway
and wife to David Calloway conveying tract ''A,'' and
a conveyance made by the same grantor to defendant
McPherson conveying tract ''B,'' and a conveyance by
said McPherson to defendant McDaniel conveying the
same tract.

The case made on the facts is this:

The defendant Mary J. Calloway is the widow of said David Calloway, deceased. After acquiring title to tract "A" as above, David Calloway died intestate in February, 1897, leaving a large landed estate, said widow and two sons, her co-defendants, William J. and Josephus—she taking a child's share.

The defendant, William J. Calloway, bought tracts "A" and "B" on the foreclosure of "C" on April 6, 1891—the land being knocked down to him on a bid of $1200, he receiving a trustee's deed and at once putting it of record. He conveyed tract "B" to defendant Mc-Pherson by an ordinary quit-claim deed bearing date of April 22, 1891—McPherson recording his deed the next day. The consideration expressed was $550, none of it going to Calloway and all of it passing directly to the defendant W. F. Hendricks. On the same day McPherson took a quit-claim deed from W. F. Hendricks for tract "B," which deed mentioned the same consideration. This latter deed he did not record. On the fourth day of May, 1891, McPherson by quit-claim deed conveyed tract "B" to defendant McDaniel for the expressed consideration of $700, but the amount actually paid was $550; McPherson at the same time handed McDaniel the unrecorded deed from Hendricks, and McDaniel did not record the latter, but on May 30th, 1891, put of record his deed from McPherson. Three years later, to-wit, on September 15th, 1894, William J. Calloway conveyed tract "A" to his father by warranty deed put of record the same day. The consideration in this deed was $2,600 and the positive and undisputed evidence shows that David Calloway paid that consideration.

The evidence shows that possession was at once taken by the several grantees under each and every of the foregoing deeds. That valuable improvements

were made by McDaniel on tract "B," and by W. J. Calloway on tract "A" while he owned it and by his father, David, during his lifetime. The present title of the Calloways to tract "A" is by descent cast, i. e., as heirs of David.

Among other defenses pleaded is that of the Statute of Limitations. On this head, the testimony shows without any substantial conflict that from the date of taking possession under each of the foregoing deeds, the several grantees therein from that time to the date of the commencement of the litigation held full, open, continuous, peaceable and adverse possession of the lands conveyed by said respective deeds, under a claim of ownership of the whole title. While the decree treated this defense *sub silentio,* yet by necessary inference it must have been disallowed by the chancellor as to each and every one of the plaintiffs.

It may be as well at this point to say that, as presently seen, the cause of action sustained by the chancellor is based on the theory that the foreclosure of "C" and the trustee's deed to William J. Calloway, following that foreclosure, were void as to the plaintiffs. Attending to when plaintiffs' cause of action, if any, to set aside that sale and trustee's deed accrued, and attending to when plaintiffs' disabilities of minority were removed, the record shows that Mary E. Hendricks was born on January 6th, 1871, she therefore attained her majority on January 6, 1889. The plaintiff, Scottie A. (now Foster) was born on July 9, 1872, she therefore attained her majority on July 9, 1890. The date of her marriage is not shown. Presumably, if she was under the disability of coverture on April 6th, 1891, it would have been shown. Plaintiff Sarah J. (now Bowen) was born October 18, 1874, she therefore attained her majority on October 18, 1892, marrying in 1902. The plaintiff Harvey A. Hendricks was born October 22, 1876, he therefore attained his majority on October 22, 1897. The plaintiff William

D. Hendricks was born September 16, 1878, he therefore attained his majority on September 16th, 1899. As already pointed out, the foreclosure sale, the trustee's deed and the record thereof were on April 6th, 1891. These dates will be of significance in connection with the running of the Statute of Limitations when taken into consideration with the date of the commencement of the litigation as presently set forth.

It is alleged in the bill and shown by the proof that Martha A. Hendricks inherited tracts "A" and "B" from her father. These lands comprised her whole estate. Her husband, William F., had no property except his estate by curtesy in "A" and "B." It was shown further that the Hendricks family at these times were in straitened circumstances. Sickness and other misfortunes seem to have pursued them; and at sundry times prior to executing "C" Martha A. and her husband had borrowed various sums of money, securing said loans by mortgaging said lands. In 1886, needing more money, and their mortgages falling due, they negotiated a loan of $1100 through their agent Mr. Bartlett from Jarvis-Conklin Company and to secure the same, as said, on November 8th in that year, executed "C." The second deed of trust referred to, of the same date, presumably was given for commission on the principal loan. Jarvis-Conklin Company then negotiated the principal note to an Eastern insurance company, and seem to have retained the commission note of $110 secured as above. The first few installments of interest on the principal note were paid. Martha A. Hendricks died intestate on October 14, 1889. No administration was had on her estate and no curators were appointed for her minor children. Presently the taxes on the land became delinquent. Presently also the interest installments defaulted. By the terms of "C," such default matured the principal debt. In this fix, the insurance company holding the principal note pressing payment, the land was advertised for sale un-

der "C," but on the request of Hendricks the advertisement was withdrawn. Being unable to pay the interest, Hendricks during a breathing spell cast about to see what he could do. In his dilemma he met up with William J. Calloway, a neighbor and a man of means. Such negotiations were had between the two that Calloway, through Mr. Bartlett, purchased the principal note and the accrued interest coupons from the Eastern insurance company and the commission note of $110, from Jarvis-Conklin Company—the latter reduced to $50 plus interest accrued after January 1, 1889. Calloway furnished Bartlett the money to buy this paper and it is not disputed that he paid therefor the sum of $1263.60—the notes being indorsed to Bartlett. This purchase was three months prior to the foreclosure sale. Calloway, on Hendricks' offer, was willing and agreed to buy tract "A" for $1600 and the evidence shows this was the full value of that eighty acres of land at that time. The question was: How could the title be transferred and the sale consummated? Casting about for a plan, Calloway and Hendricks acting under the advice of Mr. Bartlett executed and acknowledged the following "sale contract:"

"Memphis, Mo., Feb. 23rd, '91.

"This agreement made and entered into by and between W. J. Calloway and Wm. F. Hendricks, witnesseth: that W. J. Calloway hereby agrees to purchase of said Wm. F. Hendricks the following described land, viz.:

"S. E. ¼ of N. E. ¼, and the S. W. ¼ of N. W. ¼ Sec. 3, Twp. 64, R. 11 in Scotland county, Mo. at the price and sum of sixteen hundred dollars. Said Hendricks to make a good title to same.

"It being understood that said land will have to be sold under a trust deed. In order to perfect title said Calloway agrees to furnish $1265 of said money to secure an assignment of said trust deed to some party here and this said land to be sold under said deed

and bought in and deed made either direct to said Calloway or to some other party and by them to said Calloway and the balance of the money to then be paid by said Calloway to said Hendricks or his order.

"In case said Hendricks should fail to secure title to said land by said sale then Calloway is to have his money and interest thereon the same as prescribed in mortgage and Hendricks to stand all expenses incurred in said attempted sale and purchase. Said Calloway is not to interfere with the sale of said premises under said trust deed or prevent said Hendricks from procuring title in himself to the other land covered by said trust deed.

"It being understood that said Hendricks is desirous of saving it for a home for himself and family (that is the 40 acres in section 5 township 64 range 11 west). Said Hendricks agreeing to let said Calloway have the 80 acres at $1600 if purchased.

"In witness whereof, we have hereunto set our hands and seals.

" (Seal.)          W. J. CALLOWAY.
  (Seal.)          W. F. HENDRICKS.

"Said Calloway to rent said 80 acres to said Hendricks at $128 per year for the year 1891, and expires March 10, 1892, at which time possession is to be given without notice. The said rental to be deducted from the $1600 purchase price less 8 per cent interest from time deed is procured to Nov. 1st, 1891, at which time rent is considered as due.

"W. J. CALLOWAY,
W. F. HENDRICKS."

The evidence makes it clear that Calloway purchased the secured paper in order to get title to tract "A," that this was done at the suggestion of Hendricks to relieve the crisis imminent in his family's affairs. The dominating idea seemed to be, as shown by the proof, that Hendricks had a curtesy in tract "A." fronting on the street to be improved. If the line

which he wanted to preserve and which Calloway was willing to aid him in preserving, and the plan contemplated that Calloway would buy tract "A" for $1600, which sum would leave enough surplus over the indebtedness secured by both deeds of trust to pay Hendricks for his curtesy in that tract. Calloway was indifferent to tract "B," but evidently the idea of Hendricks, as disclosed by the testimony, was to get title in himself to tract ".B," thereby changing his life estate to a fee simple estate in disregard of the legal rights of his children, or to so handle the title as to result in that, and evidently Calloway winked at the foreclosure sale producing that very result. The chancellor found that W. J. Calloway and W. F. Hendricks "fraudulently and corruptly entered into a conspiracy for the fraudulent and corrupt purpose of defrauding these plaintiffs out of their estate in the lands of their deceased mother," etc. The evidence does not warrant such finding or such stinging expletives. To the contrary, it shows that the Hendricks family were in hard lines, that the father as the head of the family adopted this plan to save something from the wreck, so that he might use the property to keep the wolf from the door, keep his little family together and rear them. The most Calloway did was to let him have his way and give him a lift. Hendricks squandered none of the money he received, but used it for his family. Three of his children were bitten by a mad dog, shortly afterwards, were sent to Chicago for treatment and the estate was entirely dissipated in the support and care of his family. Hendricks shortly after the sale received from Calloway the small difference between the $1,600 agreed to be paid for tract "A," on the one hand, and the mortgage indebtedness and the taxes accrued on the other, and leased tract "A" from Calloway for one year. Shortly after the sale he negotiated the sale of tract "B" to McPherson and, on their joint

request, Calloway quit-claimed it to McPherson, who paid Hendricks more than the forty was worth as prices then ran for that character of real estate in Scotland county. McPherson bought for McDaniel and with McDaniel's money, except that Hendricks received as part pay a certain Fugate note on which McPherson was surety for Hendricks; and, in pursuance of McPherson's understanding with McDaniel, he at once transferred tract "B" to him. The evidence satisfies us that McPherson knew that Calloway held the title to tract "B" for Hendricks' use and benefit, and what McPherson knew, McDaniel was bound to know. The evidence does not show, however, that either McDaniel or McPherson had any part or lot in, or knowledge of, the *minutiae* of the dealings between Calloway and Hendricks. That is, neither of them took part in the negotiations between Hendricks and Calloway leading up to the foreclosure, neither was present at the sale, neither of them knew of the sale contract, nor of how Calloway came to have a disposition to aid Hendricks in acquiring title to tract "B" to the exclusion of his children or in disposing of that title for Hendrick's benefit. Some years after the expiration of the lease on tract "A" Hendricks and his children moved to the Indian Territory where they have since resided in accord as one family.

There fell a time when Hendricks was written to by an attorney of Scotland county and was inquired of whether he and his wife had ever re-executed "C." It seems that the land description in that trust deed as well as in the second deed of trust was originally so written that the township read "66," instead of "64" as it should. It seems that in the January, following the November when these trust deeds were first executed, there appeared a re-record of both showing new acknowledgments and a change from the wrong to the right township in the land description. Hendricks wrote

denying they were ever re-executed or re-acknowledged by him or his wife. Following that letter, a suit in equity was instituted by plaintiffs in the circuit court of Scotland county on March 6th, 1900, against McDaniel and Wm. J. Calloway alone. The cause of action sued on was that "C" was a forgery and its foreclosure was void because of the forgery, therefore "C," the trustee's deed and all subsequent conveyances should be annulled. In that suit such proceedings were had as resulted in a nonsuit. Within one year a new suit was instituted based on two theories. One was the old theory of forgery, but the other was entirely new, to-wit, the theory that the trust deed was valid, but that the sale was void for irregularities in its conduct and because made in pursuance of the wrongful understanding and purpose of Hendricks and Calloway. In this second suit, of the present defendants, only McDaniel and William J. Calloway were made parties and such proceedings were had that plaintiffs again suffered nonsuit. Within a year thereafter, to-wit, on the 22nd of September, 1902, the present suit was instituted and again only McDaniel and William J. Calloway were made defendants, and the cause going on change of venue to Schuyler county, defendants demurred to the bill and their demurrer was sustained. Thereupon, July 12, 1903, plaintiffs filed their first amended bill again making only McDaniel and William J. Calloway defendants. This bill was demurred to and the demurrer was sustained. On the 12th day of February, 1904, plaintiffs filed their second amended bill. To this bill for the first time Mary J. Calloway and Stephen McPherson were made co-defendants with McDaniel and William J. Calloway. David Calloway (then dead) and William F. Hendricks were also made parties defendants. William F. Hendricks waived service of summons and on March 25th, 1904, Mary J. and Josephus Calloway were summoned to answer. There-

upon a demurrer was filed and sustained to the second amended bill. Afterwards on July 11, 1904, a third amended bill was filed making certain other parties co-defendants. A demurrer was filed to this bill and over-ruled.

The trial petition is very long and complicated and we can condense the substance of it into a few words. The pleader, still clinging to the idea that "C" was a forgery, pleaded facts which if sustained by the proof would have made good that charge. We might as well say this: there never was any foundation for that dark charge. It is wholly untrue and the chancellor, *nisi*, found it false. But this is not all there was of the amended petition. Allegations were made to the effect that after the death of Martha A. Hendricks all the defendants conspired to cheat and defraud plaintiffs out of their inheritance in their mother's real estate. Particular averments were made sufficient to allow the introduction of the proof hereinbefore set forth show-ing the purchase of the secured notes by William J. Calloway; the contract between him and Hendricks, the trustee's sale brought about and managed to consum-mate that deal, the fact that Calloway in effect, though bidding at the foreclosure sale for tracts "A" and "B," settled with Hendricks on a basis of $1600 for tract "A" alone; that he took the title to tract "B" and held it for a time for the benefit of Hendricks and parted with it to McPherson as heretofore indicated. That McPherson had notice and so had McDaniel. It is alleged, but not shown, that William J. Calloway had always been in possession of tract "A" since the sale, that the transfer to his father, David, was a sham, that no consideration passed and that David Calloway knew of the fraud and conspiracy of defendants. It is aver-red, but not shown, that David Calloway immediately quit-claimed the land back to his son William J., which deed in pursuance to the fraudulent scheme had been

held from the record. The bill also alleges that the estate by curtesy of W. F. Hendricks passed to the defendants McDaniel and W. J. Calloway, but that waste had been committed and that the life estate had become forfeited on account of that fact. The proof failed in sustaining that charge. Relief was prayed cancelling the deeds aforesaid, that plaintiffs' interests in the real estate be established and spread of record, that an accounting be had, and that if trust deed "C" be found good, then, that plaintiffs be permitted to redeem therefrom, etc.

The answers denied the allegations of the petition. As said, the Statute of Limitations was pleaded as a defense. It was alleged, also, that David Calloway was an innocent purchaser for full value, and so were Mc-Pherson, McDaniel and Wm. J. Calloway. The good faith of William J. Calloway is alleged in trying to aid his neighbor in distress by purchasing eighty acres of the land for its full value and in paying to him as and for curtesy the small difference between that value and the mortgage indebtedness, plus the taxes and costs of foreclosure, and in allowing tract "B" to be held in his name and afterwards conveyed to McPherson for the benefit and at the request of Hendricks.

Any other facts necessary to the determination of the vital legal questions raised will appear in connection with their discussion in the body of the opinion.

I. It is contended on behalf of plaintiffs that nothing contained in the bill of exceptions is before us. It is argued that it does not contain the motions for a new trial and in arrest, and does not show any exceptions saved to the overruling of the motion for a new trial. The bill of exceptions (as well as the record proper) show that motions for a new trial and in arrest were filed in the cause on the date the decree was entered. That bill contains the following statement: "Defendants (naming them) filed their motion for a new trial,

which motion was in words and figures as follows, viz.: (clerk here copy motion for new trial) and on said March 6th, 1905, during the same term of court, said motion for new trial coming on for hearing the same was by the court overruled, to which action of the court in overruling said motion for new trial the defendants at the time excepted and still except.'' The bill contains the same matter, *mutatis mutandis,* relating to the motion in arrest.

On such showing is there substance in plaintiffs' contention? We think not; because:

(a) The printed abstract furnished, in this case the whole record, is inartificially arranged. But enough appears to show that the foregoing statement is part of the bill of exceptions; therefore, it cannot be said that no exception was saved to overruling the motion for a new trial.

(b) The main point made by counsel is that motions for a new trial and in arrest are not bodily copied into the bill of exceptions at the places named in the calls; and, it is argued, these omissions are fatal. It does appear that these motions are copied in full in the record, but they do not appear bodily in the bill of exceptions following the caption: ''Abstract of Bill of Exceptions Filed July 13, 1906.''

In 1885 (Laws 1885, p. 219), the code of appellate procedure was amended and that amendment appears as section 866, Revised Statutes 1899. The latter section was further amended in 1903 (Laws 1903, p. 105), in particulars not material here—section 866, *supra,* so far as material, reading: '' . . . . ; but it shall not be necessary, for the review of the action of any lower court on appeal or writ of error, that the motion for new trial, in arrest of judgment, . . . . shall be copied or set forth in the bill of exceptions filed in the lower court: *Provided,* the bill of exceptions so filed contains the directions to the clerk to copy the same,

and the same are so copied into the record sent up to the appellate court.''

The mischief struck at by section 866, *supra,* is not dark. It need not be got at by labor in reasoning; because, the Act of 1885 held an emergency clause telling its own story, reading: ''Whereas, there are a number of appeals now pending in which the bill of exceptions filed in the lower court does not set forth the motion for new trial and in arrest of judgment; and, whereas, such appeals should be determined according to justice and the law, an emergency arises; therefore, this act shall take effect and be in force from and after its passage.''

When we consider the prior state of our statutes in connection with the caselearning on the point, as shown by a long line of decisions industriously collated by plaintiffs' learned counsel, all of which called for the copying of motions for a new trial and in arrest bodily into bills of exceptions, it is clear that the object of the amendment was to do away with that very thing. The idea was that if the motions were put in the record once, they need not be put in twice, *provided there was a call for them in the bill itself.* Such is the conclusion to be drawn from Arnold v. Boyer, 108 Mo. 310, where the new legislation was referred to. The point was squarely held in judgment in Kreibohm v. Yancey, 154 Mo. l. c. 80, *et seq.* In that case there was a call for the motions in the bill, but the motions themselves were not copied therein but appeared elsewhere in the printed abstract, as here. This was held sufficient. Obviously it could not be well held otherwise without striking down the law. The amendment under consideration can be said, like a statutory torch, to have burned up the old rule of practice. So, too, the learning of the older cases relied upon by counsel became as a tale that is told—of value only to scholars in jurisprudence, who, reminiscent, trace the evolution of the law.

The point is ruled against plaintiffs.

II. It is contended the bill does not state a cause of action, that its allegations are contradictory and self-destroying, that McPherson, and Mary J. and Josephus Calloway were improperly joined as defendants and brought in after the case had gone on change of venue to Schuyler county. That there is a misjoinder of five separate causes of action, without mutuality of subject-matter, parties or remedy.

Is there merit in these contentions? In our opinion, no, because:

(a) By refusing to stand on their demurrer and by answering over, defendants waived all questions relating to misjoinder and multifariousness in the bill. [Spillane v. Railroad, 111 Mo. 555; White v. Railroad, 202 Mo. l. c. 561, et seq., and cases cited; Hudson v. Wright, 204 Mo. l. c. 424, et seq.]

(b) It is true that by answer, defendants Mary J. and Josephus Calloway "denied that this court has any jurisdiction of this action as to the defendants here answering, and ask that same be dismissed." On this state of the answer, the following observations are pertinent: The answer makes no allegations of facts showing lack of jurisdiction. It is in the form of a *denial* of an imaginary allegation in the petition. If, however, it be allowed as an affirmative allegation then it is open to the objection that it pleads a mere conclusion. It states no facts upon which a lack of jurisdiction could be predicated. It leaves the trial court to grope in the dark on the point in the mind of counsel. If facts showing a lack of jurisdiction appear in a petition, the objection should be raised by demurrer. [R. S. 1899, sec. 598.] If they do not appear in the petition, they should appear in the answer. [R. S. 1899, sec. 602]. This answer does not meet the requirements of good pleading on the point in hand. The general rule is that questions relating to the jurisdiction of the person of defendants

are waived by answering over. [Padgett v. Smith, 206 Mo. 1. c. 313]. That rule will be applied here.

(c) The insistence that the bill states no cause of action, and that its allegations are contradictory and self-destroying has been considered. It is not claimed there is no general equity stated. The idea is that the allegations destroy each other, and in that sense the bill states no cause of action. It seems to grow out of the notion that with one breath it charges "C" is a forgery and in the next charges it is valid, but that its foreclosure and the trustee's deed consummating the foreclosure are void because of acts preceding and attending the sale. True, the bill does not with precision obey the statutory admonition relating to pleading in the alternative; for Revised Statutes 1899, section 626, provides that: "Either party may allege any fact or title alternatively, declaring his belief of one alternative or the other, and his ignorance whether it be the one or the other." But a liberal gloss shows the pleader was standing on two theories, one of which might be false and the other true, and that if either be true there was equity in the bill. No motion to elect was made. The alternative at least faintly appearing, we rule the point against defendants, since it does not go to the merits.

III. The depositions of defendants William J. Calloway, William F. Hendricks and W. F. McDaniel were taken before Mary J. and Josephus Calloway and Stephen McPherson were made parties defendant. Before the trial, said defendants filed a motion to suppress said depositions as to them, because taken before they were parties to the action. Neither of them was present at the taking of the depositions, or had any notice of or connection with the taking. This motion was overruled—we cannot understand why. It ought to require no citation of authority to sustain the proposition that a deposition cannot be read against one not a party

to a suit at the time it was taken. As to such party there is no suit pending. [R. S. 1899, sec. 2877]. Defendants excepted to the court's overruling the motion, and the depositions were read at the trial. It is insisted that the motion cannot be considered because not incorporated into the bill of exceptions. But the bill of exceptions contains a reference to the motion to suppress, a call for the clerk to copy the same, the ruling of the court, and the exception. The motion to suppress appears elsewhere in the record supplied to this court, and under the amendment to section 866, Revised Statutes 1899, made by the General Assembly in 1903 (Laws 1903, p. 105), that is sufficient. That amendment provides that *any* motion properly identified and deposited with the clerk need not be copied or set forth in the bill of exceptions, provided the bill contains directions to the clerk to copy the same.

It is next contended that the attention of the lower court was not called to the matter in the motion for a new trial. But we think that clauses 7 and 12 of that motion were sufficiently definite to direct the attention of the court to that point. However, in its final decree, the court made a finding to the effect that the depositions were only admissible against defendants William J. Calloway and W. F. McDaniel. In this condition of things, we cannot say the original error materially affected the merits of the case, hence, the decree cannot be reversed on that ground.

IV. Under the issues and proofs, the Calloways have no interest except in tract "A." It is shown they take title by descent cast, *i. e.*, as heirs of David Calloway, deceased. If, now, David Calloway was an innocent purchaser for value then two propositions follow as a sequence and are necessarily true, viz.: *First,* in such case we need not consider any infirmities in the title of William J. Calloway prior to his deed to his father, David; for it is a commonplace of the law of real

Hendricks v. Calloway.

property that an innocent purchaser for value takes the title discharged of secret outstanding equities and trusts not of record and that, having a good title himself, he can transfer one to a grantee who even had notice, and of course a good title descends to his heirs. [Craig v. Zimmerman, 87 Mo. 475]. *Second,* in such case questions relating to the Statute of Limitations or to equitable doctrines of subrogation, redemption, or to others mooted, need no consideration in connection with tract "A"—the case being disposed of as to that tract before those questions are reached.

We have gone over the evidence line upon line, and have come to the conclusion that David Calloway was an innocent purchaser for full value. Men are not usually dishonest. Human nature is not as prone to do wrong in business transactions as sparks are to fly upward. In the law there is a presumption in favor of innocence. It is familiar doctrine of everyday use in the administration of justice that if a transaction comports as well with honesty as dishonesty, then the law takes the nobler and better view of that transaction. Here, David Calloway is shown to be a man of independent means, owning land on two sides of tract A. His son, William J., was his own man doing business on his own hook. He was not insolvent. So far as this record shows, plaintiffs had ample redress against him personally for damages sustained by any wrong in connection with the foreclosure sale of tract A, or in the wrongful disposition of the purchase money. There was not an *iota* of evidence that the father had aught to do with the foreclosure, or the negotiations and dealings between his son and Hendricks. There is nothing indicating he purchased the land to put it out of the power of plaintiffs to pursue any equitable remedy. He paid full value, took a warranty deed, went into possession, made improvements, and died without knowing of plaintiffs' claim; nor did he have notice of facts putting him on inquiry. The records of Scotland coun-

ty showed a perfect legal title in his son for several years prior to his purchase. These facts appearing, the law applicable to them seems well stated in McVey v. McQuality, 97 Ill. 93, as follows:

"In the next place, it is earnestly insisted that the evidence did not satisfactorily show that at the time of the conveyance to McVey he had any knowledge of the equities of the McQuality heirs. Or, in other words, it is claimed that he is a purchaser for a valuable consideration, without notice of complainants' rights, and, as such, is entitled to the protection of a court of equity.

"The allegation of notice in the bill is a material one, and the *onus probandi* rests upon complainants. There is no ground for diversity of opinion as to the measure of proof which the law requires upon this question. It is well established by an unbroken current of authority that where it is sought to defeat a clear legal title of record by one having a mere equitable title, on the ground that the equities of the latter were known to the former at the time of acquiring the legal estate, the allegation of notice must be established by clear and satisfactory proof. The evidence should leave no reasonable doubt of the fact of notice. It is the settled policy of the law to give security to, and confidence in, titles to the landed estates of the country which appear of record to be good." See, also, Gordon v. Ritenour, 87 Mo. 54, and cases cited.

Plaintiffs' counsel concede the burden was on their clients to prove fraud in matters preceding and attending the foreclosure sale. But they say that, having proved fraud in the origin of the title, the burden shifts and that one who takes title from a fraudulent grantee must purge himself—he must show his innocency.

That question was approached, from the standpoint of *pleading*, in the dissenting opinion of Sherwood, J., in Lincoln v. Thompson, 75 Mo. l. c. 638, *et seq.* It was again considered from the standpoint of both

211 Sup.—36

pleading and evidence in Conn. Mutual Life Ins. Co. v. Smith, 117 Mo. l. c. 292, *et seq.* In that case the learned judge writing the dissenting opinion in the Lincoln case spoke for the court in holding that the *onus* of proving himself a *bona fide* purchaser rested on the grantee (defendant) denying his guilt or asserting his innocence. There is a line of cases elsewhere sustaining that doctrine, of which samples are: Shotwell v. —Harrison, 22 Mich. 410; Lloyd v. Lynch, 28 Pa. St. 419; Weber v. Rothchild, 15 Ore. 385; Miller v. Fraley, 21 Ark. 22; Long v. Dollarhide, 24 Cal. 218; Jewett v. Palmer, 7 John. Chan. 64; Sillyman v. King, 36 Ia. 207.

In some cases a presumption has been indulged against a party to a suit who, charged with fraud, stands mute under the accusation and refuses to testify. Obviously, that presumption could not be indulged here for the mouth of David Calloway was not closed by mortal will or hand.

The rule invoked by the line of cases just cited is that applied in cases of negotiable paper where the payor charges and proves fraud in its execution or utterance. In such cases the burden is cast upon the indorsee to show good faith. [Clifford Banking Co. v. Donovan Com. Co., 195 Mo. l. c. 285, and cases cited.] The rule should be applied with nice discrimination and not mechanically when it is sought by its use to uproot clear record titles to real estate. In may cases it might result in a gross perversion of justice if heirs, of such age and so situated as not to be expected to know anything of the transaction, were required to prove a negative, *i. e.,* lack of notice in their ancestor. It is believed the uniform practice, *nisi,* has been that the complainant should both charge and prove notice to a subsequent grantee of the fact of fraud, or notice of such facts as put the grantee upon inquiry. The precise question, however, may be reserved in this case, because here the bill alleged notice and participation in the fraud, while the answer denied the fraud, denied no-

tice and pleaded David Calloway's good faith. Here, plaintiffs introduced no proof tending to show notice, while defendants introduced as much proof sustaining their averment as the nature of the case made possible, considering the death of their ancestor.

In this condition of things, the chancellor found that David Calloway "took title to the eighty-acre tract with full knowledge of the corrupt and fraudulent conduct of his grantor." We hold the decree was not supported by the proofs in that particular and cannot stand for that reason. We hold, further, that the title to tract A passed to the heirs of David Calloway free from plaintiffs' equities, if any.

V. As to tract B the case presents more difficulty and another question. McDaniel took title from McPherson. McPherson took title from W. J. Calloway. McPherson held and McDaniel holds under quit-claim deeds; and the bald question presented, in the first instance, is this: Can a grantee who holds under a quit-claim deed be such an innocent purchaser as will defeat existing outstanding trusts and equities not the subject of record under our Registry Act? That is not a new question in this State and must be answered in the negative. A grantee in a recorded quit-claim deed for value who has no actual notice holds a good title against a prior unrecorded deed, subject to record, and holds a good title against any equity *to which the recording act applies.* [Mann v. Best, 62 Mo. l. c. 497; Fox v. Hall, 74 Mo. 315, and cases cited; Munson v. Ensor, 94 Mo. l. c. 508, *et seq.*; Ebersole v. Rankin, 102 Mo. l. c. 504; Hope v. Blair, 105 Mo. l. c. 95; Hickman v. Green, 123 Mo. l. c. 178; Elliott v. Buffington, 149 Mo. l. c. 676; Strong v. Whybark, 204 Mo. l. c. 347, *et seq.*; Weissenfels v. Cable, 208 Mo. l. c. 534.] The above doctrine has become a settled rule of property in this State. But all the foregoing cases recognize the following element in the rule under consideration, viz.: That a quit-claim

deed does not bar outstanding equities *not* the subject of record. MACFARLANE, J., in Hope v. Blair, *supra*, aptly defines the rule and its limitations, thus:

"A purchaser by quit-claim deed for value will acquire the title, as against a prior unrecorded deed, and every instrument in writing, which may be recorded, whereby the real estate conveyed may be affected in law or equity. This rule results from the operation of sections 692 and 693 [R. S. 1879] of the Registry Act which invalidates the prior deed if not recorded . . .

"Equities which arise from transactions or a state of facts which may not be required to be in writing, or recorded, if in writing, are not to be cut off by a quit-claim deed. As to them it only has an operation, coextensive with its terms, of releasing such rights and interests as the grantor has at the time of the conveyance. The land in the hands of the purchaser remains subject to such equities. [Ridgeway v. Holliday, 59 Mo. 444; . . . . Stoffel v. Schroeder, 62 Mo. 147.]"

Plainly plaintiffs' equities do not arise from transactions or a state of facts required to be in writing or recorded. Hence, they were not cut off by the quit-claim deeds.

The premises considered, two questions remain, viz.: (1) Are there any outstanding equities in favor of plaintiffs as to tract B; and (2) does the Statute of Limitations create a bar against plaintiffs or any of them? Of these in order.

(a) It is clear elementary equitable doctrine that a combination to depress or chill bidding at a foreclosure sale leaves the land subject to redemption by the non-participating owners of the equity of redemption as against a purchaser who is party to such a combination put in operation. In such case chilling is killing. The facts in this case bring the foreclosure of "C" within that doctrine. Moreover, the written contract between Calloway and Hendricks, although not cor-

ruptly entered into, operated as a legal fraud on the heirs of Martha A. Hendricks. Viewed from its four corners that instrument was intended to result (and did result) in the following things: (1) That W. J. Calloway should get the title to tract A for $1600. (2) That tract B should also be sold although it was not necessary to sell the same in order to pay the mortgage indebtedness. (3) That Hendricks, whether he or Calloway bid in the property, should become the beneficial owner of tract B. (4) And, finally, that the children's interest as remaindermen in the equity of redemption in that tract should be cut away.

Such of the children, who were minors at the time, were wards of chancery. It is the delight of equity to protect the orphan in his estate—to stand between the weak and the strong. The sale was made in pursuance of the written contract. It was made at an early and unusual hour. The bidding was perfunctory and according to schedule. Tract A was offered separately with no bid—why? If only tract A had been sold and Mr. Calloway had bought it in at a bid of $1200 and if, thereafter, he had, as a matter of kindness and bounty to a poor neighbor, bought off his possession or had dealt with his poor neighbor on the theory of allowing him curtesy in the tract in spite of the foreclosure—a different question would be here. One may do what he will with his own, so long as he injures no man. But in this case it was known the value of tract A was $1600. Calloway agreed and was willing to pay that sum for it. There was, then, no necessity for the sale of tract B, and its sale must be referred alone to the scheme of Hendricks (aided by W. J. Calloway) to divest his children's title as remaindermen out of that tract as heirs of their mother and vest it in him, or put it where it would be subject to his sole use and control. The sale of B was intended to have that result and no other. It had no other. Equity cannot blink that fact

nor put the stamp of its approval on that transaction, however good the motives prompting it. It follows that unless barred by the Statute of Limitations the title to tract B should be vested in plaintiffs, subject to the life estate of Hendricks now owned by defendant McDaniel.

(b) That the *legal* title, including Hendricks' life estate, passed by the foreclosure sale is beyond question. That plaintiffs' cause of action in equity to set aside the sale and the trustee's deed consummating it accrued on April 6th, 1891, is beyond question. That adverse, open, and peaceable possession was at once taken of tract B under a claim of ownership of a full and perfect title commenced on that date, ought not to be questioned. And that such possession was continuous is true. It must not be forgotten that McDaniel and his grantors were not claiming title and holding possession under Hendricks' unrecorded quit-claim deed. They did not enter and were not holding in subordination to any life estate. They claimed the *whole* title, and, under such circumstances, the Statute of Limitations at once began to run in their favor, except as against claimants under disability.

Plaintiffs Mary E. and Scottie A. were eighteen years of age prior to the foreclosure sale. At this point a question arises, viz.: When did plaintiffs first sue on their claim of equitable title based on fraud connected with the foreclosure of C? They brought a suit to clear away the cloud of C and (incidentally) the foreclosure under it, based on the theory of forgery, on March 6th, 1900, but suffered a nonsuit in that case. On May 13th, 1901, they, for the first time, asserted a claim of title based on the theory that C might be valid, but its foreclosure void. To our minds this was not the same cause of action sued on originally. Defendants' learned counsel contends it was essentially a new case on a new cause of action. We think so ourselves.

It results from this view that plaintiffs, Mary E. Hendricks and Scottie A. Foster, are barred by limitation.

VI. As pointed out heretofore, Mary J. Calloway and Josephus Calloway were made parties defendant in February, 1904. Defendants make interesting contentions relating to the Statute of Limitations bottomed on that fact (Cytron v. Railroad, 205 Mo. l. c. 700, *et seq.*), but such contentions can only relate to tract A and therefore have no relevancy to the question in hand.

VII. The effect of what was done at the foreclosure was to discharge the entire mortgage indebtedness. It was the intention that the sale of tract A to W. J. Calloway should produce that result. As that tract is lost to the estate and passed to the Calloways, we are of the opinion that justice would be done by giving heed to the maxim: "Equity considers that done which should have been done." In this way the case is disentangled and relieved from complications relating to redemption.

Other questions discussed by counsel are not deemed vital.

The cause is reversed and remanded with directions to the lower court to find in favor of all the Calloways as to tract A against all the plaintiffs; to find in favor of McDaniel against plaintiffs Mary E. Hendricks and Scottie A. Foster, and to vest the title to their respective undivided interests in tract B into McDaniel; to find also in his favor as to the life estate of W. F. Hendricks; and to find in favor of the remaining plaintiffs, decreeing into them their respective undivided interests in tract B, subject, however, to said life estate. And to enter a decree in accord with all the above findings.

All concur.