GEORGE W. VOGEL and CABELL G. VOGEL, Respondents, v. A. BUSHNELL, Appellant.

Kansas City Court of Appeals, February 16, 1920.

1. **LIBEL: Joint Damages: Misjoinder: Waiver by Answering.** In a suit by two individuals for damages resulting from a libelous publication, unless the defendant demurs for misjoinder he waives the ·point, and if he demurs and subsequently answers, he also waives it.

2. ———: ———: **Partners.** Defamatory words published of partners in relation to their business may be sued for in a joint suit and recovery may be had for damages to their joint business, but not for any injury to their private feelings.

3. ———: ———: ———: **Petition Construed.** A liberal construction of the petition after verdict indicates that the suit was brought by plaintiffs not as partners, but as individuals on two causes of action, one for damages alleged to have been suffered by them as partners to the partnership business; the other for damages suffered by them separately as individuals.

4. ———: **Incompetent Evidence: Effect on Jury Though Later Stricken Out.** Where damaging evidence on the question of damages suffered by the partnership was ·permitted by the defendant to come in without objection and where the court at the first objection made indicated that such evidence would be ruled out as the damages would be limited to the individual damage suffered, and the court at the close of all the evidence did strike out such evidence, the defendant may not complain.

5. ———: ———: **Harmless Error.** Where a witness is permitted to testify as to his construction of a plain and unambiguous letter, and such construction placed by the witness on the letter went no further than the letter itself, the error in permitting the testimony was harmless.·

6. **DAMAGES: Actual and Punitive: Excessive.** Although the actual damages of $2500 and punitive damages in the same amount were perhaps justified under the evidence, where the verdict is as much as the total value of the property owned by defendant, the punitive damages will be held excessive in the amount of $1000.

Appeal from Jackson Circuit Court.—*Hon. Thos. J. Seehorn*, Judge.

AFFIRMED (conditionally).

*Atwood, Wickersham, Hill & Popham* for respondents.

*Harding, Deatherage, Murphy & Stinson* and *Clarence S. Palmer* for appellant.

BLAND, J.—This is a suit for libel. Plaintiffs recovered a verdict and judgment for $2500 actual and $2500 punitive damages and defendant has appealed.

The publication of the libelous matter grew out of the following circumstances:

On August 30, 1916, defendant, being an owner of an automobile, purchased a tire of plaintiffs who were at the time partners engaged in the business of selling tires at retail in Kansas City, Missouri, as local distributors of the "Knight" tire. Plaintiffs guaranteed the tire to run 8000 miles "if properly kept inflated and not abused." The tire ran 4617 miles when it was worn out. This was in the early part of March, 1917. At that time defendant took up with plaintiffs the matter of an "adjustment" of the tire. An adjustment consisted of an allowance on the purchase price of a new tire, the value of the unused mileage on the old. When plaintiffs examined the old tire they found that it had not been kept properly inflated and had otherwise been abused by the use of mud chains thereon on a dry roadway. However, plaintiffs told defendant that they would take up the matter of adjustment with the factory, which they did and reported to defendant that the factory would reimburse plaintiffs if they desired to adjust the tire on the assumption that it had gone the mileage claimed, and that it had not been abused as aforesaid. The price of tires had risen about 17¼ per cent. between the time defendant purchased the old tire and its wearing out. Thereupon plaintiffs offered defendant a new tire of the price of $41.45 for $31.08, the difference being represented by the value of the unused portion of the old tire.

Defendant refused to accept the proposition claiming that, according to his way of figuring the adjustment, he was entitled to a new tire upon the payment of $16.28. There was a material difference between plaintiffs' and defendant's method of calculating the adjustment.

Defendant became incensed that plaintiffs did not adjust the matter on his basis and threatened to send out letters to plaintiffs' competitors reflecting upon plaintiffs' business integrity if plaintiffs did not adjust on defendant's figures. Plaintiffs, in order to satisfy defendant so that he would not send out the letters, offered a new tire for $29.11, and this not being satisfactory to defendant, plaintiffs offered to give defendant a new tire for $25, and then for $20. All these offers were refused by defendant during the month of March, 1917, and, finally, plaintiffs refusing to make any better offer and to come to defendant's terms, the latter, on April 21, 1917, sent to plaintiffs' competitors the following letter, upon which this suit for libel is based:

"Telephones Home 1449 Main, Bell 2754-X Grand. All agreements are contingent upon strikes, accidents and delays beyond our control.

Established 1886
A. Bushnell
903 Broadway

Red Cedar Shingles, Pacific Coast Lumber, Oak Lumber, Piling, Telegraph Poles & Posts.
Wholesale. Yellow Pine Lumber, Oak Bridge Timbers
A Specialty.

C. H. BUSHNELL,
Manager Yellow Pine Dept.
Kansas City, Mo., April 21st, 1917.

To whom it may concern:

This is to certify that I purchased last Fall a Knight Tire, from the distributing Company in Kansas City, of the Knight Tire and Rubber Co., guaranteed by them in writing to run 8,000 miles. The tire proved worthless after running 4,617 miles and the Knight Tire and Rub-

ber Co., and their distributors refused to make good the guarantee.

IF YOU·WANT TO PAY A HIGH PRICE FOR A WORTHLESS TIRE, ON A WORTHLESS GUARANTEE, BUY A KNIGHT TIRE.

The worthless tire and the worthless guarantee can be seen at my office.

(Signed) A. BUSHNELL,
903 Broadway, City."

It is not shown how many of these letters were sent out by defendant. He threatened to send out three thousand of them and admitted that he sent out twenty-one. Prior to the sending out of the above letter, defendant's landlord desired to buy some Knight tires but defendant told him that "he had better wait and see what those fellows" (meaning plaintiffs) "guarantee amounted to before he bought them." Defendant wrote plaintiffs, "Let me know what you propose to do about it," (accepting defendant's figures) "as I would like to inform my landlord whether you are straight or crooked down there." Defendant wrote the Knight Tire and Rubber Company, the manufacturer of Knight tires, about his controversy with plaintiffs and stated: "I think . . . that your company ought not to have persons that misrepresent your tires and then not stand for their guarantee." The Knight Tire Company refused to assume any responsibility in the matter saying, in effect, that the contract of guarantee was between defendants and plaintiffs. Defendant then wrote the Knight Tire and Rubber Company "If the representatives of the Knight tire are going into the Kansas City market and tell what the Knight tire will do and put their guarantee in writing and then both they and the Knight Tire and Rubber Company repudiate the guarantee which I have in writing, I propose to send a copy of this guarantee to every Rubber tire company in Kansas City and explain what the Knight tire guarantee amounts to and tell them that the Knight tire, from my experience, is no better than any cheap tire that can be

got for half the money.'' In another letter to the manufacturer defendant wrote:

"It seems peculiar that the Knight Tire and Rubber Company which has a high rating in R. G. Dunn would get the 336 Tire Service Company" (this was the plaintiffs' firm name) "which is such a worthless concern as to have no rating at all not even a low one in R. G. Dunn to get out and make false representations and give worthless guarantees, about the Knight Tire and keep them at the same office at 1528 Grand Avenue and then say they are not responsible for anything they say about the Knight Tire or anything they may guarantee."

Later defendant wrote the branch manager of the manufacturer in Kansas City inclosing a copy of the letter, supra, that he afterwards mailed out on April 21st, and said that a letter of which the inclosed was a copy would be sent out to every one who handled tires in Kansas City unless an adjustment was made by April 18th on his figures. The manufacturing company protested that the letter defendant threatened to send out must be amended so that it would apply to the distributors only, whereupon defendant wrote it,—

"I am not afraid of your legal department in the least as in my younger days I practiced Law for five years and I know when I have a good tire and when I have not got one, and if you want any notoriety and want to crawfish out of your guarantee or your distributors' guarantee and sue me for damage I will see that you get all the notoriety you want and see that your tire men are on hand when this case comes up. But the notice will go out as I have said unless you fix it up by April 20th."

The evidence shows that soon after the libelous letter was sent out by defendant that dealers in tires in Kansas City were in possession of the same; that plaintiffs' customers would make inquiries of plaintiffs concerning the letters and that their business began to fall off and in a few months it fell off so much that plaintiffs (or the corporation of which they owned all of the

stock) were required to retire from business as it was
no longer profitable.

On March 30, 1917, plaintiffs formed a corporation
and Articles were issued to it by the Secretary of State
on that day. The property listed in the Articles to form
the basis of the capital stock constituted all of the prop-
erty of the partnership including the accounts. The
property was not in fact turned over to the corporation
until May 1, 1917. This suit was first brought in the
name of the corporation and the petition alleged dam-
ages to the business of the corporation. Later the pe-
tition was amended and plaintiffs as individuals were
substituted for the corporation as parties plaintiffs.
This amended petition, which was filed on December 6,
1917, alleged that at the time of the libelous publication
and a long time prior thereto plaintiffs were partners
carrying on a general automobile tire and accessories
business in Kansas City, Missouri, that they were the
sole distributors "in said district" of the "Knight"
tires, that they had spent large sums of money in build-
ing up the Knight tire business and that they enjoyed
a substantial trade in the sale of such tires; that the
Knight tire was a tire of good quality and that there
was a great value in the trade name thereof; that plain-
tiffs for the tire and for themselves had established a
good reputation for honesty and fair dealing; that plain-
tiffs had sold defendant a Knight tire and had gotten
into a controversy with him over the matter of adjust-
ing the tire and that defendant had mailed out a great
many copies of the letter, supra, upon which this suit
is brought (here the petition copies the letter); that
plaintiffs were the persons referred to in the letter as
the distributors of the Knight Tire and Rubber Com-
pany and that the persons to whom the letter was sent
so understood; that the charges in the letter were false:

"That defendant in said publication charged and in-
tended to charge, and such charge was so understood by
the public and those who read the same, that the busi-
ness agreements of plaintiffs and guarantees issued by

them as business men were worthless, and would not be kept, and that plaintiffs were unreliable, dishonest and would not keep their agreements and make good their guarantees, and that the Knight Tire, which they sold and were engaged in selling as a business, and a livelihood, were worthless, and that these plaintiffs were engaged in imposing upon the public and selling worthless tires; and plaintiffs state that they were thereby held out before the public and described in said letter as being unreliable and dishonest as distributors and as business men and were selling to the public worthless articles, and were thereby held up to riducule and scorn before the public, and greatly humiliated, shamed, disgraced and injured in their feelings, and caused to suffer great mental anguish and mortification, and were further damaged in their reputation for honesty, business integrity and fair dealing, and were injured in their good names and reputations before the public as business men and good citizens.   .   .   .

Plaintiffs state that by reason of the false and malicious publication, acts and conduct of defendant, aforesaid, the sales and business of plaintiffs dropped off and became lessened, and they were deprived of sales and profits, and were greatly injured in their general reputation and standing as business men, and their reputation as good citizens and business men of standing, honesty, integrity and fair dealing, has been greatly damaged and they have been caused to suffer great mortification, injury to their feelings, mental anguish, shame and humiliation, and they have been damaged thereby.''

The answer, among other things not now in issue, consists of a general denial and an admission of the writing of the letter and a pleading that the representations contained therein were the truth.

The first point raised by defendant is that the court erred in refusing his instruction in the nature of a demurrer to the evidence at the close of all the evidence, for the reason that no partnership was in existence at

the time of the publication of the libelous letter and no joint action could be maintained.

It is well settled that when two or more persons are libeled by the same writing they cannot join in an action for the damage as the wrong done to one is no wrong to the other. One of the exceptions to this rule is that defamatory words published of partners in relation to their business may be sued for in a joint suit by the partners and recovery be had for damages to their joint business but no damages can be recovered for any injury to private feelings. [Newell, Slander and Libel (3 Ed.), secs. 446, 469; Townsend on Slander and Libel (4 Ed.), sec. 303; Folkard's Starke on Slander and Libel, sec. 189; H. G. Woods Notes.] But where the language affects the partners both as partners and individually, the partners, in addition to a joint action for damages to the firm, may sue separately for the damages to them individually. [Newell Slander and Libel (3 Ed), sec. 469.].

After verdict the petition must be liberally construed in favor of the plaintiff. Such a construction of the petition in this case shows that plaintiffs brought this suit not as partners but as individuals on two causes of action: (1) for damages alleged to have been suffered by them as partners to the partnership business while they were in fact partners; (2) for damages suffered by them separately as individuals. Now the trial court was of the opinion that when the corporation was formed on March 30, 1917 (this was three weeks prior to the sending out of the libelous letter), and plaintiffs' business and assets were made the basis of the capital stock that plaintiffs were estopped to say that they did not in fact turn over the business to the corporation until May 1, 1917, as to allow them to say that they turned over their business and dissolved partnership later than March 30, 1917, would be fraud on the State. Therefore, being of the opinion that the partnership was out of existence on April 21, 1917, and therefore could not have been libeled on that date, the court,

at the close of all of the evidence, instructed the jury that they were not to consider "the testimony in the case with respect to any injury or damage to the business or property of the plaintiffs and the corporation" and submitted to the jury only damages done to plaintiffs in a personal way — "their reputation, standing, the mortification, humiliation, and injury to their feelings . . . their general reputation and standing as business men."

If it be insisted that the damages that were submitted to the jury and that were alleged in the petition under the allegations of "personal" as distinguished from "partnership" damages are not joint damages and must be sued. for separately (see authorities supra), then defendant is in no position to make the point for he not only did not demur or strike at that part of the petition, as he could well have done, but answered over, and even had he demurred, having answered over, he would have waived the misjoinder. [Belt v. St. L. I. M. & S. Ry. Co., 190 S. W. 1002; Hudson v. Cahoon, 193 Mo. 547; Hendricks v. Calloway, 211. Mo. 536, 557; Hanson v. Neal, 215 Mo. 256, 277.]

Complaint is made of plaintiff's instruction No. 2. It is claimed that the instruction submits to the jury that plaintiffs were partners and distributors of the Knight tire at the time of the publication of the libel. We do not find that the instruction does this. The instruction reads "if you find . . . that plaintiffs were at the *time of such dealings* mentioned in the publication, partners" etc. (Italics ours). The objection to instruction No. 5 is based on the contention that it "allows the jury to assess damages which are only authorized in individual actions." From what we have already said this was proper.

It is insisted that most of the evidence touching damages was loss to the business and that the court could not, by withdrawing such evidence from the jury after they had heard it, remove from the minds of the jurors the *virus* of the incompetent evidence. Of course, evidence concerning loss to partnership business was not admissible and much damaging evidence on

that score was admitted but we have closely examined the record and find that there was no objection to this evidence until near the close of plaintiffs' case, when there was a motion by defendant to strike it all out. The court thereupon ruled "the damages will be limited, of course, to the individuals composing the partnership." "Put in your evidence concerning the date upon which the articles of incorporation took effect. You will have plenty of time to do that, and, then I will act upon your motion." As already stated, the court did strike out this testimony at the close of all the evidence. We cannot convict the court of error in allowing the evidence, harmful as it was, to get into the record in the first place when there was no objection to it when it was offered, and he had no opportunity to rule it out at that time. From his subsequent rulings there is no question but that he would have refused to admit the testimony had it been objected to when first brought out. From what we have said, defendant is in no position to raise the point. [Fuller v. Robinson, 230 Mo. 22, 50.] The case was not tried upon one theory and submitted on another. Although the evidence was particularly strong on the question of damage to business there was ample evidence tending to show "personal" damages. There was a failure of proof on the question of damage to partnership but not as to the individuals. The case was submitted on one of the theories of the evidence.

It is insisted that the court erred in allowing the witness, Matlock, who was engaged in the tire business in Kansas City and who received one of the libelous letters, to testify that he understood the letter to mean "that the distributors of the Knight tires were not dealing in good business principles, and that they were selling a tire—that the product which they sold was not up to the standard." The objection at the trial to this testimony was that the letter was unambiguous and it was improper to allow the witness to put his construction upon it. We think that the words used in the letters were plain and not susceptible of a double meaning. The letter meant at least as much as the

witness testified that it meant and while the court erred in not refusing the testimony, such refusal was not reversible error as the witness's testimony could have had no bearing on the issue as the meaning of the words in the letter was obvious and consequently the testimony could have had no effect whatever on the minds of the jury. [McCollum v. Smith, 199 S. W. 271; Brown v. Wintsch, 110 Mo. App. 264, 268, 269.]

It is insisted that the verdict is excessive. We are not prepared to say that the verdict for actual damages is unwarranted. In personal torts the courts tenaciously hold the parties to the damages found by the jury as in such cases there is no scale by which the damages can be graduated. They admit of no other test than the intelligence of a jury governed by a sense of justice. [Minter v. Bradstreet, 174 Mo. 444, 504.] Numerous considerations must necessarily enter into the question as to what is just compensation in a case of this kind but no definite rule can be laid down. What is mortification, humiliation and injured feelings to one man is not necessarily so as to another. How much a business man's standing and reputation would be affected by a given libelous publication would depend upon a great many things. We are unable to say under all the circumstances that a verdict of $2500 actual damages in this case is excessive.

There was good cause for the assessment of punitive damages in this case. The controversy between plaintiffs and defendant was of a nature that comes up daily in business transactions where both parties to the transaction cannot be right but where each is perfectly honest in his contention. In this case the defendant had given to the jury instructions to the effect that if the jury found his contention in the dispute to be right they should find a verdict for him. The jury by returning a verdict for plaintiffs found that defendant was wrong in his contentions. But at the least there was room for an honest difference of opinion between the parties, yet defendant, in order to force plaintiffs to his terms from which he would not budge even when plaintiffs

had altered their terms two or three times so that there was a difference of less than $5 between them, threatened to send out broadcast a letter intended to do great harm to plaintiffs in a business and personal way. Defendant was deliberate in sending out this libelous letter. He did not send it out upon a sudden angry impulse but had it prepared for some days before mailing and actually furnished a copy to plaintiffs and the manufacturing company and told them that if they did not come to his terms he would mail it out so as to do the maximum amount of damage. No man under our law has a right to thus attempt to club another into submitting to his terms. Business dealings would be queer indeed if one man may threaten ruin to his adversary and have in his possession an instrument that would well be calculated to bring about ruin if the latter did not yield the last penny in a transaction where there arose a dispute founded upon an honest opinion and position entertained and contended for by such adversary. The jury in assessing punitive damages in this case inflicted upon defendant a merited rebuke. If it were not for other facts hereinafter discussed we would have sustained in this case a much larger verdict for punitive damages had such a verdict been returned. The facts show that defendant had been in the wholesale lumber business for thirty-three years. There is no evidence as to whether that business was prosperous, the inference being that it has been in the sense, at least, that it was able to stand on its feet, or it could not have continued so long. The testimony is that defendant is worth but $5000. He has $20,000 in life insurance. He testified, "I am worth more dead than I am alive." Evidently defendant's business has not brought him in a great amount of money or he would have been possessed of greater wealth by this time. As before stated, there is no evidence as to what the business is worth. There is no direct evidence of defendant's age. He practiced law in 1872 so he must now be well on the declining side of the hill of life. The total amount of the verdict equals the value of all

of defendant's property. If the verdict stands he is left an old man without property. In view of all the facts and that defendant has a business, we think that a substantial part of the punitive damages should stand, but we think that the verdict for punitive damages is excessive in the sum of $1000. If plaintiffs will, within ten days, from the judgment remit the sum of $1000, it will be affirmed, otherwise it will be reversed and remanded.

All concur.