H. M. HOFFMAN, Appellant, v. MARGUERITE PYATT HOGAN ET AL.,
Defendants, MARGUERITE PYATT HOGAN and MONARCH FINANCE
CORPORATION, a Corporation, Appellants.—137 S. W. (2d) 441.

Division Two, February 21, 1940.

904

*Wm. M. Fitch* and *N. C. Hawkins* for defendant-appellants.

*Morrell DeReign* and *Corbett & Peal* for plaintiff-appellant H. M. Hoffman.

WESTHUES, C.—This suit was filed by plaintiff Hoffman to quiet title to a tract of land containing 394.28 acres lying in Pemiscot County, Missouri. Defendants, Hogan and Monarch Finance Corporation, filed separate answers wherein they asked the court to set aside certain deeds under which plaintiff claimed title, and to decree title to be in defendant, Mrs. Marguerite Pyatt Hogan, subject to a deed of trust in favor of defendant Monarch Finance Corporation. Defendant, Mrs. Hogan, also asked the court to compel the plaintiff, Hoffman, to account for rents and profits for the years 1934, 1935, 1936 and 1937. Plaintiff filed a reply to these answers asserting ownership to the land. Plaintiff also stated that since he had taken possession, claiming the land as his own, he had made valuable improvements in the way of clearing the land and erecting buildings thereon. That, in a nutshell, is what this suit involves. The pleadings cover one hundred and thirty-two pages of the abstract. Contentions pertaining to various phases of the case will be referred to in the course of the opinion. The trial court found for the defendants on the question of title. The court also rendered an accounting of rents and profits. By its decree it allowed the plaintiff for the improvements and found that defendant, Hogan, owed plaintiff a balance of $1741.18. The court found for plaintiff on defendants' count in ejectment. By the decree plaintiff was permitted to remain in possession of the land until the sum of $1741.18 was paid. From that judgment both plaintiff and defendants appealed.

This being an equitable proceeding, so made by defendants' answer and plaintiff's reply, this court has the duty to try the case *de novo*. But in such cases due deference is often given to the finding

of the trial chancellor, especially on questions of fact over which there was a sharp dispute in the testimony.

Plaintiff based his claim of title on deeds executed by the sheriff of the county pursuant to judgments for drainage taxes and sales had thereunder. In July, 1932, defendant, Marguerite Pyatt Hogan, who will be referred to as Mrs. Hogan, became the owner of the land in controversy, subject to a deed of trust executed by one Fred Boyer. This deed of trust and the notes therein described were then the property of the defendant, Monarch Finance Corporation, located in Peoria, Illinois. Defendant, Mrs. Hogan, and her husband lived near St. Louis, Missouri. In the year 1933, Hogan, acting for his wife, began negotiations with the plaintiff, Hoffman, about the renting or selling of the land in controversy. The tenant on the land at that time was not satisfactory to the Hogans. Hoffman finally agreed to rent one hundred and forty acres of the land for the year 1934, for $250 cash, on condition that the then occupant would be dispossessed. Hoffman recommended the law firm of McKay & Peal to Hogan. McKay & Peal, acting for Hogan, brought about the eviction of the tenant, and Hoffman took possession of the one hundred and forty acres. He attempted to rent some of the other land but was not successful. He also attempted to obtain a purchaser, but due to farming conditions in general and the deed of trust on the land no purchaser could be found. About that time the Hogans were sued for taxes by the drainage district. McKay & Peal were engaged to defend this suit. A plea in abatement was filed. In July, 1934, a judgment was entered and immediately thereafter the land was advertised for sale. A sale was had on August 15, 1934, at which Hoffman became the purchaser. Hoffman paid the cost of the sale and was given deeds to the property by the sheriff. Prior to this Hoffman had asked the Hogans to extend the time for the payment of the rent to September 1, which request was granted. Hoffman, however, never paid the rent. Neither McKay & Peal or Hoffman notified the Hogans that a judgment had been entered for the drainage taxes or that the land had been sold. In 1936, Mrs. Hogan wrote Hoffman demanding the payment of the rent. The finance company was demanding interest on its loan. This company had not learned that the land had been sold since they were notified of the tax suit by publication. After the demand for rent was made Hoffman instituted the present suit to quiet title.

The trial court cancelled the deeds executed by the sheriff purporting to convey the land to Hoffman. The court held that the judgments and sales were void. This action of the trial court was manifestly correct. To fully understand the situation we must briefly relate some circumstances that had a bearing on this tax sale. The record discloses that at the time of the tax sale in 1934, and for a number of years prior thereto, farming in Pemiscot County was at a

low ebb. Prices of farm products had been such that it was almost impossible for a great number of landowners to derive a sufficient revenue from their land to pay the county, State and drainage taxes. Sales pursuant to tax judgments would not bring a sufficient amount to even pay the taxes and in many cases not even the cost of the suit. Landowners were in danger of losing their holdings, the drainage districts their taxes, and the bondholders their investments. It is said that self-preservation is the first law of nature. So in this case, the circumstances just related prompted landowners of the various drainage districts of the county to organize what was called a tax protective league. The purpose of this organization was to protect the land from being sacrificed at tax sales and to preserve it for the owners. It was mutually understood that the members of the league would not bid against each other but permit the owner to bid the land in at the sales. It was also agreed that bidding by outsiders should be discouraged. Many tracts of land were advertised to be sold on August 15, 1934, the same date on which the Hogan land here in dispute was sold. Members of the taxpayers' league were at the courthouse in great numbers. A Mr. Waugh, an attorney from St. Louis, was there representing the bondholders. He had intended to bid at the sale for the purpose of protecting his client's interest. Shortly before the sale, however, and while Mr. Waugh was in the courthouse on his way to the circuit court room, he was assaulted in the midst of a throng of men. Suffice to say here that Mr. Waugh was so treated that he dared not appear at the sale. Plaintiff, Hoffman, was a member of the league and was present at this time. At the sale he bid in the Hogan property. The evidence justifies the inference that Hoffman knew the Hogans were not informed that the land was to be sold. Hoffman's purchase of this land at the sale violated even the principles of the league of which he was a member, the primary purpose of which was to preserve the land for the then owners. Hoffman took advantage of this situation, since he was a renter on the land, and purchased it for himself by merely paying the cost of the case, which was far less than his bid. We may say that it was customary to make the sales bring the cost and no more. At this very time Hoffman owed the Hogans $250 as rent, and also $281.92, which he had received from the government for retiring nineteen acres of cotton land. The tax attorney for the drainage district was barred from the practice of his profession for a period of six months for misconduct in handling these sales. [See In re Pate, 119 S. W. (2d) 11.] That case may be read for a detailed account of the manner in which these tax sales were conducted. The sales were mere shams. The facts above related fully justified a cancellation of the deeds executed by the sheriff conveying the land in question to Hoffman. There were other defects in the proceedings. The plea in abatement was still pending at the time the judgment was taken against Mrs. Hogan.

The tax suit had been brought in the name of the State. It should have been brought by the collector on behalf of the drainage district. However, we need not consider those defects, because we are satisfied that the facts above related fully justified a cancellation of the deeds. On this subject this court in Hendricks et al. v. Calloway et al., 211 Mo. 536, 111 S. W. 60, l. c. 68 (a), tersely stated:

"It is clear elementary equitable doctrine that a combination to depress or chill bidding at a foreclosure sale leaves the land subject to redemption by the nonparticipating owners of the equity of redemption as against a purchaser who is party to such a combination put in operation. In such case chilling is killing."

In the present case not only was the bidding chilled but a prospective bidder was knocked cold. Better times were in store for the landowners, as government contracts, retiring land from cultivation, brought them substantial checks. Prices rose to a point where it was profitable to raise corn and cotton, the principal crops relied on in that locality. Also, the county court refinanced the bonded indebtedness of the various districts.

Plaintiff had secured a quitclaim deed from the Farmers Bank of Portageville, purporting to convey to him the land in question. This deed was also cancelled by the decree of the court. The board of directors of the bank had not authorized the execution of this deed. On a later date the board of directors authorized the execution of a quitclaim deed conveying its interest in the land to the defendant, Mrs. Hogan. Plaintiff claims that his deed should not have been cancelled and that Mrs. Hogan received no interest by her deed from the bank. The bank had had a deed of trust covering this land, executed by a former owner. Under a sale the bank had obtained title to a one-half interest in the land. In the meantime the property had been conveyed by warranty deeds to the defendant, Mrs. Hogan. The deed of trust of the bank was not mentioned in these transfers. The note, secured by the deed of trust held by the bank, was fully paid. The bank did not claim any real interest in the land. It is the contention of the plaintiff that the bank had no real interest in the property. Note the allegations of plaintiff's reply where it was alleged that one Gallivan executed the note and deed of trust to the bank. The reply then goes on to say:

". . . the above Deed of Trust was foreclosed and at the sale or the same the other real estate aforesaid brought a sufficient sum to pay off the indebtedness of the said Thomas Gallivan and his wife, under said note and Deed of Trust to the Farmers Bank of Portageville, and that thereafter, said Farmers Bank of Portageville released the land described in Plaintiff's petition to said Thomas Gallivan and his wife and never thereafter made any claim to the same, for the reason that the other lands described in said Deed of Trust brought sufficient funds to pay off the said Farmers Bank, and there-

after, said Farmers Bank never claimed any right, title or interest in and to the lands described in Plaintiff's petition, . . ."

If that be true, then the chain of title through warranty deeds carried the ownership of the land to Mrs. Hogan. Therefore, insofar as plaintiff is concerned, the cancellation of the quitclaim deed did not affect his interest. Plaintiff claimed the title of Mrs. Hogan through the sheriff's deeds. If these deeds were valid plaintiff had title, if cancelled Mrs. Hogan had the title. We have heretofore disposed of that question.

As to the interest of the defendant, Monarch Finance Corporation, it need only be said that if the sheriff's deeds conveying the property to plaintiff are eliminated, then the finance company holds a valid lien through its note and deed of trust. The trial court so found.

Now as to the accounting. We would be inclined to deny plaintiff any amount for improvements if his claim had no other support than his alleged ownership under the sheriff's deeds. However, we find from the record that Hogan, at the time he rented one hundred and forty acres of this land to plaintiff and authorized him to rent the balance to others or sell the land, had an understanding with plaintiff wherein he, plaintiff, was authorized to clear the land and make improvements. Note Hogan's evidence:

"Q. State whether or not in that conversation you had there with Doctor Hoffman, there in the presence of the family, anything was said about the costs of clearing the land? A. He told me it could be cleared very cheaply, that he could get niggers to do the work and it would cost from 1 to 3 dollars an acre to clear it. He said he would eventually build tenants houses and barns and said the average 2 room house would be 150 to 160 dollars and a barn or a good sized shed that would probably cost 25 to 30 dollars more, but about $200.00 would provide a house and barn for the average tenant. That talk took place on the first visit. . . .

"Q. Can you tell the court why you didn't say anything to Doctor Hoffman about wanting the rent until August 10-36? A. In the beginning I figured he was fixing the place up and I would give him a break. I figured he would be good for it."

That evidence, coming from Hogan, certainly indicated that plaintiff was authorized to clear the land and build tenant houses and barns. His right under that agreement was not forfeited by his subsequent actions in attempting to get the title through the sham tax sales. The trial court was therefore justified in giving plaintiff credit for the amounts expended by him on improvements. We have carefully gone over the evidence concerning the various items claimed by plaintiff. We have reached the conclusion that the learned trial judge was too liberal to plaintiff on a number of items for which he was given credit. For example, plaintiff was allowed $10 per acre

for clearing two hundred acres of land. We do not mean to say that clearing the land did not add $10 in value per acre, but the evidence disclosed that the cost of clearing was far less, and plaintiff was not entitled to more than the cost. Plaintiff employed a foreman to look after this work who testified as follows:

"Q. What was the largest amount paid for clearing any one acre? A. $3.00 I guess there was fifty acres cleared at $3.00 and 25 acres at $1.50 and about 25 acres at $1.25. I cleared it all and put it in cultivation, in 1936."

A Mr. Nelson also did some clearing. He testified that he and others cleared nine acres for $1.25 per acre, and four acres at $5 per acre. We learn from the record that most of this land was easily cleared and one man could clear about two acres per day, as it was only necessary to cut a little brush. Some of the land required more labor, but no one testified that any of it cost more than $5 per acre, and only four acres cost that much. We are of the opinion that $750 would be ample to reimburse plaintiff for clearing two hundred acres of land. The trial court allowed $2000. Plaintiff, while on the stand, did not dispute the evidence as to the cost of clearing. He only stated he did not remember what it cost. The trial court also allowed $1800 for building four tenant houses and a barn. Defendants contend that this amount was excessive. We think the allowance liberal, but are inclined to let it stand, because from the conflicting evidence it would be difficult for us to accurately determine the cost. We therefore defer to the judgment of the trial court. The trial court also allowed plaintiff a claim of $1895.46 for taxes paid by plaintiff for the years 1934, 1935 and 1936, and included interest on the amounts paid. The item of interest will be referred to later. The purchase price plaintiff paid was also allowed with interest. The plaintiff introduced evidence that clearing the land and building tenant houses and the barn added a value of about $30 to $40 per acre. That evidence is of no value in determining the cost of the improvement, and, as we have stated above, the cost is all plaintiff is entitled to have allowed. The trial court by its decree charged plaintiff with $250 rent for the year 1934. This was according to the agreement and was proper. Plaintiff was also charged with $281.92 for the year 1934, and $299 for the year 1935, which amounts were paid plaintiff by the government for retiring land from cultivation. Plaintiff was charged rent at $5 per acre for two hundred acres for each of the years 1935 and 1936; for the year 1937 he was charged $5 per acre for three hundred acres, making a total allowance of $3500. Only such land as was actually cultivated and on which crops matured was charged against plaintiff. Land which overflowed was not charged. We are of the opinion that $5 per acre was not sufficient. The plaintiff admitted on the witness stand that the rental value was $5 to $6 per acre. The government was

allowing about $15 per acre for retiring cotton land from cultivation. The government therefore figured that $15 was about the rental value. Witnesses for the defendants, however, placed the rental value of cotton land at $10 to $12 per acre and other crops as corn, hay, etc., at $5 to $6 per acre. Cotton was selling at $50 to $60 per bale during the years 1935 to 1937. Corn varied from fifty cents to $1 per bushel. The evidence disclosed plaintiff to have been a good farmer. In 1936 he raised about one hundred and sixteen bales of lint cotton. It was selling at about $60 per bale, which netted an income of over $6000 for the cotton crop, excluding revenue obtained for the cotton seed. During this same year he also raised twenty-five hundred to three thousand bushels of corn. It was selling at about $1 per bushel. The trial court charged him $1000 rent for that year, or $5 per acre for two hundred acres. The other years may not have been as profitable, but the plaintiff in his reply made the statement, "that the rents for the year 1937 will not exceed the sum of $2000. That at least was a tacit admission that the rent was worth $2000 for the year 1937. The trial court allowed $1500. Five dollars per acre was far less than the evidence justified. However, in deciding the question of the amount to be allowed we will take into consideration the finding of the trial court. So viewing the situation from every angle, we feel that $7 per acre, per year, will not be a liberal allowance for cash rent. The total amount, as allowed by the trial court, was $3500. At $7 per acre the amount would be $4900. On that basis there would be a total charge against plaintiff of $5730.92, which would be $1400 more than allowed by the trial court. Credits allowed plaintiff, as above stated, would amount to a total of $4822.10, which would leave a balance due defendant, Mrs. Hogan, of $908.82. To this item we must add the amount of interest allowed to plaintiff on the purchase price and the taxes paid. The trial court improperly allowed plaintiff interest on these various items, because plaintiff had in his possession an amount of money due the defendant, Mrs. Hogan, which exceeded the amount of the purchase price and the taxes paid. As above noted, plaintiff owed the defendant $250 rent for the year 1934, also $281 which he received from the government. That was far in excess of the purchase price paid by plaintiff. Rents due defendant exceeded the amount of taxes paid. Defendant, Mrs. Hogan, was not allowed any interest by the trial court on the amounts that the plaintiff owed her. We therefore disallow interest to either plaintiff or the defendant up to the time of entering judgment in the trial court. The total interest allowed to plaintiff was $268.09. Adding this sum to the above mentioned $908.82 makes the total due defendant, Mrs. Hogan, by plaintiff, $1176.91. In these allowances we are of the opinion that we have been liberal with the plaintiff and if it were not for the finding of the trial court the amounts charged against plaintiff would have been greater.

■ Next, defendants insist that the trial court should have given them a judgment of eviction on the ejectment count. The decree indicates that the only reason the trial court found for plaintiff on the ejectment count was because of the balance found to be due the plaintiff. The decree stated that plaintiff should remain in possession until plaintiff had been reimbursed, and no longer. The points of law presented upon this phase of the case are now moot questions because our finding makes it imperative that a judgment on the ejectment count must go in favor of the defendants.

■ An embarrassing situation arose during the trial of this case which had as its basis the following: As above indicated, McKay & Peal represented the Hogans in the tax suit. Mr. McKay later died. In the present suit Mr. Peal represented Hoffman as against the Hogans, his former clients in the tax suit. Letters written by the Hogans to McKay & Peal, concerning the tax suit, were offered as evidence against the Hogans. The trial court rightly rejected them on the ground that they constituted confidential communications between attorney and client. Hogan accused the attorneys of "selling out." We need not discuss this question in detail. Suffice to state that Mr. Peal ought not to have represented Hoffman in the present suit. The interest Hoffman claimed in the land was derived through a judgment against Mrs. Hogan, rendered in a suit which McKay & Peal were employed to defend. An attorney cannot represent conflicting interests.

" 'The test of inconsistency is not whether the attorney has ever appeared for the party against whom he now proposes to appear, but it is whether his accepting the new retainer will require him, in forwarding the interests of his new client, to do anything which will injuriously affect his former client in any matter in which he formerly represented him, and also whether he will be called upon, in his new relation, to use against his former client any knowledge or information acquired through their former connection.' "

[In re Boone, 83 Fed. 944, l. c. 952. See also In re Moffett Bros. et al. v. Moffett et al., 345 Mo. 741, 137 S. W. (2d) 507; Rochester v. Gonterman (Mo.), 49 S. W. (2d) 71; 6 C. J. 590, sec. 49; 5 Am. Jurisprudence, page 296, secs. 64, 65, 66.] In the latter section we read:

"Even after the relation of attorney and client terminates, the obligation of the attorney to preserve inviolate the confidence reposed in him by his former client continues. Hence, an attorney cannot, upon the termination of an employment, represent one whose interest in the transaction is adverse to that of his former client, . . ."

We do not mean to hold or find that Mr. Peal was guilty of any intentional wrong. We suggest, however, that Mr. Peal refrain from participating as an attorney in any further litigation which may arise out of the present controversy.

It is therefore ordered, that that part of the judgment of the trial court cancelling the deeds through which plaintiff claimed title and decreeing the title to be in Mrs. Hogan is hereby affirmed; that that part of the decree finding the deed of trust and note of the defendant, Monarch Finance Corporation, to be a valid lien against a one-half interest in the land is hereby affirmed. The judgment pertaining to the accounting is hereby amended to conform to our finding as above indicated. The trial court is hereby directed to enter a judgment in favor of the defendant, Mrs. Hogan, against plaintiff, Hoffman, in the sum of $1176.91. The judgment of the trial court, insofar as it permitted plaintiff to remain in possession until the defendants should reimburse plaintiff for improvements, is hereby set aside and the trial court directed to enter a judgment in the defendants' favor on the ejectment count entitling them to the immediate possession of the land. The judgment of the trial court apportioned the cost of the case among the parties plaintiff and defendants. On this question we defer to the finding of the trial court which is hereby affirmed. The trial court is also directed to require the plaintiff to account to the defendants for rents and profits for the time plaintiff had possession of the land after December 27, 1937, the date the judgment of the trial court was entered, unless the parties settled that question among themselves. It is so ordered. *Cooley* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.