SIDNEY SMITH, INC., Plaintiff-Respondent,

v.

Simon S. STEINBERG, Defendant-Appellant.

No. 7670.

Springfield Court of Appeals.
Missouri.

Sept. 10, 1958.

Ford & Ford, Jones & Jones, Kennett, for appellant.

Ward & Reeves, Caruthersville, for respondent.

McDOWELL, Judge.

This is an action in replevin filed in the Circuit Court of Pemiscot County, August 19, 1949, to recover 74 cases of cigarettes of the value of $5,183.68, property of the Steele Sales Company.

In 1945, Maurice D. Plough and Henry Loeb, II., residents of Memphis, Tennes-

see, were co-partners engaged in the tobacco business under the firm name of the Memphis Tobacco Company; on that date they established a tobacco business in Steele, Missouri, under the firm name of the Steele Sales Company to engage in the sale of tobacco in interstate business through the U. S. mail. They entered into a written contract of employment with defendant, Simon Steinberg, as manager of the Steele Sales Company. Under the terms of this contract defendant was to receive a salary of $50 a week and a bonus of one-third of the net profits. August 17, 1949, the business closed, defendant's employment was terminated and a sale of the goods to plaintiff by the owners, Loeb and Plough, was consummated. Plaintiff, the purchaser, demanded possession of the stock of goods from defendant, which was refused. Plaintiff filed this action.

Defendant's answer and counterclaim to the replevin action claimed a lien on the stock of goods replevied for an unpaid balance of net profits due him under his contract of employment with Loeb and Plough as manager of the Steele Sales Company and that Loeb and Plough were the real parties in interest.

The cause was tried and judgment rendered for plaintiff. On appeal from the trial court's judgment to this court the judgment was reversed and remanded. See Sidney Smith, Inc., v. Steinberg, Mo. App., 280 S.W.2d 696.

In the opinion of the court of appeals it was held that defendant was entitled to an equitable lien on the property replevied for any unpaid balance of net profits earned by Steele Sales Company under the contract of employment between Loeb and Plough and defendant and directed an accounting to determine the unpaid balance of such net profits, if any, due defendant.

On retrial of the cause the parties stipulated that the replevin issue need not be retried; that plaintiff should have judg-

ment subject to the defendant's equitable lien for the amount of the net profits, if any, found due from Loeb and Plough to the defendant. At the close of the testimony defendant abandoned his claim for net profits for the period from December 1, 1947, to November 30, 1948, and limited his claim to the period from December 1, 1948, to August 17, 1949.

In the early part of January, 1949, an investigation was instigated by the U. S. Postal Department and Louisiana State Tax authorities concerning the sale of cigarettes by Steele Sales Company to one, Anguzza, of Louisiana; that on March 17, 1949, an indictment was returned in the Federal District Court in New Orleans, Louisiana, against defendant, Loeb, Plough and Anguzza. Loeb and Plough paid, by checks drawn on the Steele Sales Company, the sum of $15,000 attorney fees and $2,297.03 expenses to Thomas L. Robinson and L. E. Gwinn, lawyers of Memphis, for representing defendant, Loeb and Plough in the investigation of the alleged crime and for the preparation of their defense. The total amount of attorney fees and costs so paid amounted to $17,297.03, which, when deducted from the earnings of the Steele Sales Company, left nothing due defendant under his contract of employment. The trial court found that if these two items were disallowed as items of expense of the Steele Sales Company, the net profits of the business from December 1, 1948, to August 17, 1949, would be $9,804.92, of which the defendant would have been entitled to one-third or $3,268.31, less $500 fine paid by said partners for defendant, (which defendant agreed should be deducted,) would leave a net of $2,768.31 due defendant.

We agree with respondent's statement in its brief that the "only substantial issue on this appeal is whether or not L. E. Gwinn and Thomas L. Robinson were employed to represent defendant Steinberg, along with Plough and Loeb, in a mail fraud indictment instituted in the Federal Court in New Orleans, and whether or

not the fee and expenses in the defense of that case were a proper charge against the Steele Sales Company."

Defendant, in his brief, adds to this issue an additional issue that the attorney fee and expenses were excessive and exorbitant.

The evidence determinative of the issues involved is conflicting and confusing. Plaintiff's evidence consisted of written and oral testimony. Thomas L. Robinson, lawyer and member of the firm of Robinson & Robinson, Memphis, Tennessee, testified that his first connection with the criminal case was in the early part of 1949 when he was called by Loeb and informed that the Steele Sales Company was being investigated and that the postal authorities and tax agents of Louisiana were either in the office of the Memphis Tobacco Company or at Steele and desired to examine the records. He testified that he advised Loeb, as attorney for the Steele Sales Company, not to permit such examination; that when he returned to Memphis he communicated with defendant and requested him to bring all the books and records, including correspondence passing between seller and purchaser; that a conference was held in his office with defendant, Loeb and Plough; that from time to time thereafter, defendant and his wife brought other correspondence to his office for examination; that on one occasion defendant called him from Steele and said the agents were there and at the bank and wanted to know what to do; that he advised defendant to inform such agents to make known what records they desired and he would cooperate. January 24, 1949, a historical statement, consisting of 43 pages, was taken from defendant concerning himself and the conduct of the business of the Steele Sales Company, in which he stated he told the investigating agents at Steele he had to consult his lawyer in Memphis and that, later, he said, "My lawyer instructed me if there was any information you desire regarding

the case, * * * contact him." Witness testified he had conferences with defendant at his office, both day and night, relative to this investigation; that attorney Gwinn was consulted in the matter prior to the returning of the indictment and from time to time as the investigation was progressing. He said it was apparent that postal authorities and tax agents of Louisiana were quite persistent in their investigation and said "We felt something was going to happen. We conferred with Mr. Gwinn." He stated what he meant by "we" was that defendant, Loeb, Plough, and possibly defendant's wife, were present at conferences with Gwinn. He stated the indictment raised a question of first impression. He testified:

"Q. Was there ever a fixed amount to be paid by the defendants, or those who later became defendants, to the attorneys who represented them in this case?" In answer to this question witness said he had represented the Steele Sales Company prior to this and then answered "After the indictment, yes".

The preliminaries leading up to the trial of the cause were performed by attorneys Robinson and Gwinn; the appearance of the defendant before the Federal Grand Jury, the making of bond, and the arraignment, admittedly, were arranged by Mr. Robinson for all of the defendants, excepting Anguzza. Witness testified that the discussion relative to the fee was had in his office after he had made a trip to New Orleans to determine what he could find out about Anguzza; that they were concerned over a series of letters exchanged by Anguzza and the Steele Sales Company; that Steinberg had been requested to bring in all such letters to determine whether or not they constituted incriminating matter; that it was during this meeting that they determined they could represent Steinberg; that there was no conflict of interest between defendant, Loeb and Plough, but he also said the fee was not discussed at this meeting. He testified the fee was first discussed after

the signing of the statement made by defendant, Loeb and Plough May 10, 1949. (This statement is in evidence as plaintiff's exhibit P–1.) In it Steinberg admits that he, as manager of the Steele Sales Company, directed all the correspondence between the Steele Sales Company and Anguzza concerning the sale of cigarettes in question; that his wife wrote the letters and he signed them. He states that Loeb and Plough were not informed of the contents of the letters or the filling of the orders for cigarettes shipped to Anguzza. In other words, in this statement, it would seem that Steinberg assumes the responsibility for the sales of cigarettes by the Steele Sales Company to Anguzza. However, there were attached certain letters to this exhibit written by Loeb concerning what should be told customers relative to the shipping of cigarettes to other states. In explanation of what took place at, and before, the signing of this statement, Robinson testified that at the request of the defendant, Loeb and Plough, he made the trip to New Orleans to determine the factual situation concerning Anguzza. He stated that thereafter he had a conference with defendant and his wife and it was his recollection that defendant's brother, Harry Steinberg, and a lawyer by the name of Brown were present when they went over the legal implications of the letters passing through the mail. He said "We segregated all of the Anguzza letters. Mr. Gwinn and I were trying to get Mrs. Steinberg to reconstruct what they said in the letter to Anguzza in New Orleans". Witness testified that the original letter, which is in evidence as exhibit P–30, was the basis of the indictment; that there was an agreement as to the amount of the attorney fee. From his testimony, no one could tell when such an agreement took place. He was asked if the agreement, as to the amount, was prior to or after the disposition of the case and he answered "No. There wasn't a fixed definite amount". He testified:

"Q. Was there a discussion between you, Mr. Gwinn, Mr. Plough, Mr. Loeb, and Mr. Steinberg about your employment as attorneys and how it was to be paid? A. Yes, * * *" The witness then made a lengthy discussion in which he said there definitely appeared there was no conflict of interest between the defendants but he did not answer the question. He said Loeb, Plough and Steinberg were present during the discussion of the payment of an attorney fee and that it was just after the execution of plaintiff's exhibit P–1. He said "After the meeting on the night of May 10th or the morning of May 11th when we, Mr. Gwinn and I, Mr. Steinberg, Loeb and Plough and Harry Steinberg and Mr. Brown, who were there to get us to represent Mr. Steinberg, which we would not accept employment until we were certain there would be no conflict". He then testified there was no special contract of employment reduced to writing. He said the fee was to be paid by Loeb, Plough and Steinberg. He said it was very important that the defendants determine not only if Robinson and Robinson would represent them but who else was to represent them, because the attorneys were in Memphis and the cause was in New Orleans. He stated they discussed the matter with Steinberg, Loeb and Plough, together with others interested in Steinberg, Loeb and Plough; that there was a discussion of employment of local counsel and that Steinberg was present; that Abe Plough was interested. He testified he went to New Orleans to interview local counsel; that one lawyer asked $25,-000 to represent them and that, together with Steinberg, Plough, Loeb and Gwinn, they came to an understanding to employ Mr. Morrison, a brother of the Mayor. Witness testified that prior to the employment of local counsel he and Gwinn had worked day and night in the preparation of the case for trial; that after the investigation was pretty well completed and the facts had been digested and analyzed from a tremendous amount

of research of the law applicable to the charges in the indictment, they discussed the matter of employing local counsel with defendant, Loeb and Plough and others. He stated that in the meantime he and Gwinn had prepared various motions filed in behalf of the three defendants. He gave this testimony:

"Q. Mr. Robinson, who was to pay the attorney fee to you and Mr. Gwinn and your associates who were engaged in the case? A. Loeb, Plough and Steinberg, incidentally, they made some payments.

"Q. Against whom was the fee to be charged? What particular partnership? A. Loeb, Plough and Steinberg and Steele Sales Company.

"Q. Was Mr. Steinberg present when that understanding was entered into? A. Yes, sir.

"Q. At that particular time, Mr. Robinson, was the amount of the fee fixed or determined? A. Partially. May I explain it?"

The explanation given was that the attorneys agreed they could handle the matter in the trial court and that a counsel of less prominence would be employed. He said the defendants agreed to this arrangement.

Witness said that Harry Steinberg and Mr. Brown did not assist in the preparation of the briefs or in the trial of the case. He stated that at the time the fine of $500 was assessed he paid it and that the expense charges claimed in the lawsuit were paid by him. Checks drawn on the account of Steele Sales Company and given the attorneys in payment of their fees were offered in evidence. These checks total up to the full amount of the attorney fee and expenses of $17,297.23. He stated the attorneys paid the local counsel but did not state how much.

Mr. Robinson was asked if in his correspondence with Steinberg, Loeb and Plough, after the return of the indictment, he and Gwinn made known to the defendants the approximate amount of their fee and he answered: "No, not after the return of the indictment. * * * We did after it was concluded not to engage the specialist in New Orleans as associate counsel."

He gave this testimony:

"Q. What was told to Mr. Steinberg, Loeb and Plough about the approximate fee, exclusive of any employment in New Orleans? A. We informed them that our fee would be approximately $15,000 and expenses. * * *"

Witness testified that during the consideration of employing special counsel he sent Steinberg a number of times to see Abe Plough and that Steinberg was fully aware of the estimated fee. He testified:

"Q. I believe you testified it was understood that the fee would be paid by Steele Sales Company? The fee and expenses? A. We explained our fee. Mr. Gwinn and I explained our fee to the defendants. We told them it made no difference whether it came from the Steele Sales Company or anyone else."

He stated he informed all of the defendants that they would require an immediate retainer and Mr. Loeb or Plough said, "We are sending to you through the mail tomorrow a check for our retainer on Steele Sales Company". He said Steinberg made no objection; that after the signing of the statement by defendant May 10th, he and Mr. Gwinn concluded there was no conflict of interest and informed defendant and his wife, his brother and Mr. Brown, they would represent the defendant. He testified he did not know whether he and Gwinn had prepared a statement some week or ten days before May 10th which defendant refused to sign. He said he recalled investigating it but he would not say whether it did or did not happen. Witness testified that Harry

Steinberg, lawyer, came to his office at his request; that the telephone calls to Steinberg could have been made from his office because he wanted Harry Steinberg to come over there. He said he wanted defendant to tell the truth about the Anguzza transaction and to determine whether any one else who had any connection with the Steele Sales Company was responsible with sending letters of questionable or incriminating nature through the mails. He gave this answer: "Yes. That is their statement to us. I might further add that it was based on that and only that, in the presence of his brother and Mr. Brown, that we agreed to represent Simon Steinberg.

"Q. Do you mean you weren't representing Simon Steinberg before May 10, 1949? A. Yes, sir. We were representing him from January.

"Q. You say Steinberg agreed to employ you as attorney and you accepted the employment prior to May 10, 1949? A. He did, yes, sir. We rendered him services. As the trial of the case approached we wanted to determine whether there would be any conflict, and we did."

There had been paid a retainer of $7,125 by check drawn on the Steele Sales Company prior to May 10, 1949.

Witness testified that he and Gwinn had been representing defendant prior to May 10th and expected to continue if there was no conflict of interest. He testified that Walter Brown came to his office. He said that Harry Steinberg had stated he was not familiar with this type of litigation and he had called in Brown, a friend. He said he was glad for both of the gentlemen to come. He gave this testimony:

"Q. As far as you know, in this case did Brown represent Mr. Loeb or Plough, or both of them? A. No. Neither Loeb, Plough or Steinberg in the New Orleans proceedings."

Witness stated Brown was with them in New Orleans at the hotel, had dinner with them but was unable to go to the court the next morning. However, the court records carried Brown's name as one of the attorneys representing defendants when the plea of nolo contendere was entered. Witness was asked who Harry Steinberg was representing and answered "He wasn't representing anyone, as far as I know". He stated he had written Harry Steinberg about the matter and sent him copies of the pleadings filed.

When asked if he and Gwinn had not prepared a statement which they desired defendant to sign and which he refused to sign, witness said he would not say that they did not make a copy and revise it to conform to the facts during the course of the conversation. He said they were insisting that defendant sign a statement of the true facts with respect to the correspondence of the Steele Sales Company to Anguzza and from Anguzza to the Steele Sales Company. He denied that he made this statement to defendant: "If Steinberg doesn't want to sign it, to hell with Steinberg, we are representing Loeb and Plough".

Witness said that on the morning of July 20th they had been holding conferences with the District Attorney in his office regarding the case and when they left he forgot his hat; that when he returned for it the District Attorney made him a proposition to dispose of the case. He said he went back to the hotel and explained to the defendant and his brother, Harry, and the other defendants the offer. He said he did not remember whether he invited Harry Steinberg to attend the conference or not. He admitted that Harry Steinberg had asked him to join him in talking to the Judge about the punishment. He also stated he informed the defendant, his brother, and the other defendants of a suggested meeting by the District Attorney in the afternoon. He said that after the conference they discussed what decisions had been reached with the District Attorney with defendant, Harry Steinberg and all of them; that the matter of entering

a plea of nolo contendere by the defendant was fully discussed. He said the court convened that afternoon and he and Gwinn, representing defendant, entered the plea of nolo contendere. He said no one appeared for Steinberg except himself, Gwinn and Morrison.

L. E. Gwinn testified that he first met the defendant in Mr. Robinson's office during an investigation of the Steele Sales Company by Federal and State authorities; that he was an attorney of record in that case. He gave this testimony:

"Q. Who employed you, Mr. Gwinn? A. Mr. Loeb, and Mr. Plough and Mr. Steinberg were all present and participated in the conference in which I was employed.

"Q. How was the fee to be paid and by whom? A. It is my recollection that it was to be paid by the Steele Tobacco Company.

"Q. Whom were you employed to represent? A. I was employed to represent Mr. Plough, Mr. Loeb and Mr. Steinberg."

He stated Steinberg was present when the employment agreement was made but he did not recollect if the fee was fixed at that time. He said the fee was finally fixed at $15,000 and paid. He testified he made as complete investigation of the law touching the case as he was capable of making; that he examined all the cases on fraud reported in U. S. Code Annotated, particularly from the 5th Circuit; that he made briefs of several hundred pages. He gave this answer: "I spent exclusively two or three months in the preparation of that brief."

This witness testified he was probably responsible for lawyers, Harry Steinberg and Brown being in Memphis; that he told defendant he wanted to be sure there was no conflict between his interest and that of Loeb and Plough of the issues involved. He said he prepared, on information furnished by defendant, the state-

ment in evidence as plaintiff's exhibit P-1, but that he did not have a copy of such statement; that he asked defendant to submit it to his brother, whom he was informed was a lawyer; that defendant later came back and said the statement was satisfactory to his brother. He said it was then that he and Robinson concluded there was no conflict of interest between the defendants.

This witness confirmed Mr. Robinson's testimony as to the preparation of pleadings, the filing of the same with the court and as to the conference with U. S. District Attorney in the trial of the matter, the entry of the plea nolo contendere by defendant on July 20th, and the agreement to dismiss as to the other defendants. He stated that the proposition made by the Government to allow defendant to enter a plea of nolo contendere was submitted to the defendant in the presence of his brother and agreed to. He testified that the attorney fee of $15,000 and expenses was reasonable; that the fee had been paid by the Steele Tobacco Company. He testified that he did not discuss the amount of the fee with Steinberg but communicated with Robinson about the matter. He gave this answer: "I didn't have any discussion with Mr. Steinberg as to the amount of the fee."

Witness then testified that at the time of the signing of the statement of the facts May 10th in a conference with defendant, Loeb and Plough, he and Robinson were employed to represent the defendants in the criminal case and that it was agreed that the fee would be charged against the Steele Sales Company. He testified:

"Q. Did Steinberg agree to that arrangement? A. If he hadn't he wouldn't have been represented. * * * I will say he did."

He gave this answer: "I think we were employed to make an investigation and to advise the parties before the indictment was returned and that employment was re-

newed or continued after they were indicted."

Witness testified that he first thought there might be some conflict because Plough and Loeb had said they did not handle the transportation of cigarettes from Missouri to Louisiana; that Steinberg had handled that matter and witness said he thought that matter ought to be settled beyond any doubt before they acted other than in an informal advisory capacity; that Mr. Steinberg never at any time made any objection or any intimation that they were not representing him. He said that defendant, when considering a statement to be signed, said he was not a lawyer and that was the reason he told defendant to call in his brother, Harry Steinberg.

He testified that he and Robinson had conferences with U. S. Attorney in New Orleans relative to the disposition of the case and that he was agreeably surprised when the District Attorney made the offer of settlement. He stated he discussed with defendant and his brother the acceptance of the offer of the District Attorney; that he did not recall any assistance from any other lawyer in the trial of the case. He said Mr. Morrison was associated with them in the event of a trial. He stated he told Robinson that the $15,000 fee was the minimum. He said he thought Harry Steinberg visited Judge Christenberry in his chambers prior to the entry of a plea.

The defendant testified that at no time did he employ Robinson and Gwinn to represent him as attorney or consent that their fee be considered as a deductible expense against the Steele Sales Company. He testified:

"Q. * * * Tell the Court if there was any agreement ever entered into by you to pay out of the Steele Sales Company any attorney fee? A. No, sir. I made no agreement.

"Q. Did you have anything to do with the employment of these two gentlemen? A. No, sir."

Witness said that he was not familiar with the arrangements made by the other two defendants; that they hired their own lawyers and he had no knowledge as to how it was handled; that he had never met Mr. Robinson prior to the alleged investigation by the Government; that Mr. Loeb called him to come to Memphis and he said "I am going to take you up to my lawyer", who was Robinson & Robinson. He said he never stated to either Mr. Robinson or Mr. Gwinn that he wanted them to represent him and that he was never present when the employment of lawyers was discussed. He said nothing was ever said to him about any fee. He denied he ever told either Robinson or Gwinn that he was solely responsible for the operation and conduct of the Steele Sales Company. He said he worked entirely under instructions; that Mr. Loeb sent copies of letters which he was to follow in answering requests for purchases in other states. He testified all of the advertising matter of the Steele Sales Company was prepared in Memphis; that Loeb and Plough purchased all the merchandise during his employment and paid for the same; that his authority was to hire the employees of the Steele Sales Company, get the mail orders out of the Post Office and fill them, see that such orders were delivered to the Post Office and that the money received for them was deposited in the bank. He denied that he, at any time, took cigarettes near the Louisiana border to deliver to Anguzza. He said he made no deliveries outside the city.

Defendant's exhibit (N) was offered in evidence, being a letter written to Mr. Loeb, Memphis Tobacco Company, which reads:

" * * * I would like to have an accounting up to this date. You refused to allow me to hire my own attorneys and you took the matter in hand without consulting me or my attorneys and your attorneys totally ignored Mr. Brown and my brother. * * * If it had not been for my brother being present, the case would not have been disposed of as yet. I would refuse to accept a plea wherein I would be given a pro-

bation sentence; it was thru my brother that a fine was given. * * *"

Defendant's exhibit (O), a letter dated August 2, 1949, in answer to defendant's letter requesting an accounting, stated that the expenses have not been brought to his attention yet and it is impossible to comply with defendant's request. The letter stated the matter could better be discussed in person rather than through the mail.

Defendant testified that on Friday, prior to when the statement was signed, May 10th, Robinson called him by long distance and asked him to come to his office early the next morning, which he did; that Robinson had a paper of a number of pages, which he said he wanted defendant to sign. He said Robinson said he needed the papers at once because he was going to New Orleans. He said he observed the statement contained a paragraph which made defendant assume all responsibility for the Steele Sales Company and exonerated Loeb and Plough. Witness said he told Robinson "No, I will have to contact my brother". He said Gwinn was not present and made no suggestion that he contact his brother; that he did not know who wrote the statement but that Robinson gave it to him and wanted him to sign it. He said when he told Robinson he wanted to contact his brother, Robinson said, "Okay, call him on long distance phone." Witness testified that Robinson placed the long distance call and he talked to his brother in El Dorado, Arkansas, who advised him not to sign anything until he could see it; that he went to El Dorado, consulted with his brother and a lawyer by the name of Walter Brown; that he called Robinson and made arrangements for a meeting with him, his brother and Brown. He said that a conference was arranged for the following week and that he, his wife, his brother, and Mr. Brown went to Robinson's office where they met Robinson, Gwinn, Plough and Loeb. He said he was advised by both of his lawyers not to sign the statement. Witness testified that Mr. Robinson became angry in the meeting when he would not sign state-

ment and said "Steinberg can go to hell, I am being hired by Plough and Loeb to represent them". He testified that Mr. Gwinn cooled Robinson down and they agreed to withdraw the last paragraph of the document; that Gwinn stated to Robinson "Let's remove the last paragraph and insert these letters in the place of it", so that was done. Witness stated that this meeting started about 9:00 o'clock and lasted until 2:30 in the morning; that all the parties went home and came back the next morning and signed the new statement, which is in evidence as plaintiff's exhibit P-1.

He stated the first trip he made to New Orleans was when he was summoned before the grand jury and that Loeb sent Mr. Robinson along; that he never asked Mr. Robinson to accompany him or asked for any legal counsel; that he did not know who was paying Robinson's expenses or his fee. He stated when they got to New Orleans Mr. Robinson went into Mr. Morrison's office and he sat out in front; that when Robinson came out he had a paper showing how to claim exemptions under the Fifth Amendment; that he refused to testify upon Robinson's advice. Defendant says that he was represented by his brother on July 20th, the day the plea of nolo contendere was entered; that up to that date he had never employed Robinson and Gwinn. He said he did not attend the conference the attorneys had with the U. S. District Attorney; that he was in the courtroom when Robinson and his brother came out of the District Attorney's office with this deal wherein the cause was to be passed as to Loeb and Plough and Robinson wanted him to plead nolo contendere and said that he would get no more than a suspended sentence. He said his brother told Robinson, "Let's go back and talk to the Judge" and Robinson said the Judge did not want to be disturbed. He testified that after his brother talked to the Judge he advised him to make the plea.

It is admitted that Brown was not in New Orleans on the day of the hearing and that Harry Steinberg had not complied with the

court rules so as to enter his appearance as attorney. It is, likewise, admitted that Walter Brown was in New Orleans on the first trip and did consult, at least, with Gwinn regarding the trial of the case.

Witness testified that during the investigation he was in constant contact with his brother but that he did not employ Brown until a few days before the conference in Robinson's office on May 10th; that he became aware that Robinson and Gwinn were solely interested in Plough and Loeb and that he needed some further advice. He gave this answer: "I needed all the assistance I could get because I was being sold down the river".

Witness testified that he was manager of the Steele Sales Company and had instructions to ship cigarettes; that he didn't recall that Loeb and Plough ever instructed him about shipping cigarettes to Anguzza. He stated he did not know whether they saw the correspondence between the Steele Sales Company and Anguzza or not. He admitted that he and his attorneys, Harry Steinberg and Brown, approved the statement made in plaintiff's exhibit P–1. He admitted that he signed the motions prepared by Robinson and Gwinn preliminary to the trial; that he swore to said motions before the clerk of the court and that the attorneys of record were Robinson and Gwinn. He admitted that when the plea of nolo contendere was entered July 20th, Robinson and Gwinn appeared as attorneys for him before the court.

The deposition of Walter Brown was introduced in behalf of defendant. He testified that he never appeared as attorney of record for the defendant in the criminal action; that he was employed by defendant and paid a fee; that he advised defendant not to sign the statement Robinson had prepared; that he went to Memphis and had a conference wherein Harry Steinberg, the defendant, his wife, Loeb, Plough, Robinson and Gwinn were present; that after a long conference an agreed statement was prepared which took out the paragraph that would have made defendant responsible for all of the action concerned and that the statement was signed. He testified he made one trip to New Orleans, representing the defendant in the case, and conferred with Robinson and Gwinn but that on the date the case was disposed of he had other matters to take care of and could not be present.

Harry Steinberg testified that he advised defendant during the investigation, advised him not to sign the statement prepared by Gwinn and Robinson, was present in the conference on May 10th when the statement was modified and signed (in evidence as plaintiff's exhibit P–1). He testified that he and Brown advised defendant not to sign the former statement because it would put him in the penitentiary; that he made two trips to New Orleans to assist his brother in his defense; that he was not advised by Robinson and Gwinn of the first conference with the District Attorney on July 20th but that after being informed of the offer to settle the matter, he was present. He stated he would not have permitted his brother to agree to the settlement until he consulted with the Judge and was informed that a fine would be assessed; that it was at that time he advised his brother to enter a plea of nolo contendere. He stated the reason he did not have his name entered of record in the trial was because of a rule of the court requiring applications to be made for entry of appearance in matters before the court; that he had made application to have his appearance entered but, at that time, it had not passed. Witness gave this evidence:

"Q. As a matter of fact, Mr. Robinson was representing your brother, was he not? A. He started out representing him back in Memphis, supposedly. I would say he was misrepresenting him.

"Q. Was it your understanding that Mr. Gwinn and Mr. Robinson were to represent your brother in the Federal Court proceedings in New

Orleans? A. It was up until the time they wanted him to sign that first instrument that made him responsible, then it ceased."

He testified that Robinson called him on the phone and said he would work with them and that he thought Robinson and Gwinn were working with the three to help get the case disposed of.

It is unnecessary to set out the substance of the many exhibits offered before the court or the depositions of the court official and the court records. That part of the evidence is not in dispute. The court records disclosed that Robinson and Gwinn were the only attorneys of record in the criminal case. That was true as to all of the preliminary motions filed and as to the entry of the plea. The record does show that Walter E. Brown was an attorney of record when the plea was entered, however, Brown testified he was not in New Orleans on that date so this entry was a mistake.

In our opinion we will refer to the appellant as defendant and respondent as plaintiff, the position they occupied in the replevin suit filed in the lower court.

In a case such as this we are not bound by the chancellor's findings, but must review the evidence de novo and reach our own conclusions as to its weight and value. However, we usually defer to the chancellor's findings when the case turns upon the credibility, weight and value of the oral testimony of witnesses who have appeared personally before him, unless we are satisfied that the findings should have been to the contrary. Pizzo v. Pizzo, 365 Mo. 1224, 295 S.W.2d 377, 385 [8]; Murray v. Murray, Mo.Sup., 293 S.W.2d 436, 439 [1, 2]; Gardine v. Cottey, 360 Mo. 681, 230 S.W. 2d 731, 18 A.L.R.2d 1100.

Under defendant's first assignment of error he complains of the trial court's action in failing to find that there was due defendant as his one-third of the net profits for the period of November 30, 1948, to August 17, 1949, (after charging against the one-third share of defendant the fine of $500.00 and hotel expenses of $6.55) the sum of $3,194.52.

With this contention we cannot agree. Under the terms of the written contract of employment, Loeb and Plough were the exclusive owners and operators of the Steele Sales Company and the defendant was the employee and manager receiving a salary of $50 per week and a bonus of one-third of the net profits. Defendant had no interest in the stock of goods and merchandise being sold. His only interest was a bonus of one-third of the net profits.

Defendant says that plaintiff's testimony to-wit, exhibit P–58, supports his contention. This exhibit contains an item of income received from the sale of mailing list, good will, etc., of $2,298.30.

In the memorandum opinion of the trial court he stated:

"Counsel for defendant have miscalculated in their brief wherein they say that the net profit of the business was $11,103.-23. This miscalculation was easily made from plaintiff's exhibit 58 for it shows a net loss to the partners after deducting the sale price of certain assets of the business. These assets being property of the partners in which the defendant had no property interest it should not be considered in determining the net operating loss or profit of the business."

We think the trial court's finding was proper. The item of "other income" was assets of the Steele Sales Company, to-wit, mailing list, etc., and was not a proper item to be considered in determining the net income of the business.

In Webster's New International Dictionary, 2d Ed., unabridged, "Profit" is defined as "The excess of returns over expenditure in a given transaction or a series of transactions; as: a. The excess of the price received over the price paid for goods

sold. b. The excess of the price received over the cost of purchasing and handling, or of producing and marketing, particular goods * * *. 4. Excess of income over expenditure, as in a business or any of its departments, during a given period of time."

34 Words and Phrases, Profit, beginning with page 405 cites numerous authorities on the meaning of the word "Profit", to-wit: " 'Profit' is an elastic and ambiguous word, often properly used in more than one sense; its meaning in a written instrument is governed by the intention of the parties appearing therein, but any accurate definition thereof must always include the element of gain. * * *

"The word 'profits' usually signifies gain realized from business or investments over and above expenditures. Citizens Nat. Bank v. Corl, 33 S.E.2d 613, 616, 225 N.C. 96."

Under the Missouri law "Profit" in the ordinary acceptation of the law is the benefit of or the advantage remaining after all costs, charges and expenses have been deducted from income. Terre Haute Brewing Co. v. Dwyer, 8 Cir., 116 F.2d 239, 242.

The evidence shows that during the operation of the business defendant accumulated a list of customers; that in making this accumulation he was furnished a telephone directory of the state of Louisiana by the owners of the business, which was used in part in making the list. We think this was property of the business and, if so, would not be an item of income to be figured in the one-third net profit. For instance, defendant had been working as manager of this business since 1945. He had received his bonus or one-third net profits and there never was any contention that he had a list of customers which was of a certain value. Had the owners not sold this business there would have been no contention that this item was a part of the profits. Under the above authorities, we must find against defendant under this allegation of error.

We find there is no merit in the contention that the trial court found contrary to evidence and pleadings of the plaintiff in reaching its conclusion.

The contention is made that the court should have allowed interest to the defendant on the amount of profits found due him.

We think it unnecessary to pass upon this issue because of our findings on the other issues involved.

■ The crux of this lawsuit is raised in assignment of error No. 2, wherein the trial court allowed, as items of expense of the Steele Sales Company, $15,000 attorney fees paid to Robinson and Gwinn and expenses of said attorneys in the sum of $2,-297.03. Of these expenses defendant admits that $500 fine and hotel expense of $6.55 are proper deductible expenses.

It is contended that Robinson and Gwinn were not employed as attorneys for the defendant in the criminal action in Louisiana but that defendant's brother, Harry Steinberg and Walter A. Brown, attorneys of El Dorado, Arkansas, represented him.

To support this allegation of error defendant refers the court to the testimony as shown by the record, which includes plaintiff's exhibit P-1 (copied in full in the appendix of defendant's brief). We have set out in the statement of facts most of the testimony referred to by defendant. The evidence on this issue is conflicting. Plaintiff relied upon the testimony of Thomas L. Robinson and L. E. Gwinn, together with admissions of the defendant and depositions of the Federal Judge and Clerk wherein the criminal case was tried and disposed of, to establish the contract of employment of such attorneys to represent defendant in said criminal action.

From this evidence we find that defendant, Steinberg, accepted the services of Gwinn and Robinson from the time the mail fraud case was under investigation by Federal agents until finally concluded. He admitted, in a written statement, that he told the Federal officers in Memphis that

his lawyer had advised him not to permit the inspection of the records of the Steele Sales Company but to make known what records they wanted to such lawyer and he would cooperate with such authorities. Defendant admitted that when he was subpoenaed before the Federal Grand Jury in New Orleans as a witness, Robinson accompanied him to New Orleans and advised him how to claim his constitutional rights before the Grand Jury. Defendant did not dispute the fact that he called attorney Robinson on the telephone, while the Federal officers were in Steele, Missouri, and asked for advice as to what to do. The evidence is uncontradicted that he held numerous conferences with such attorneys where defendants, Loeb and Plough, were present, produced the records of the Steele Sales Company kept by him as manager, relating to the sales of cigarettes from the Steele Sales Company to Anguzza; that he and his wife both had numerous consultations with these attorneys concerning this investigation and the trial of the case after the indictment, made written statements relative to the parts played by each of the defendants in the matters being investigated. Defendant makes no denial of plaintiff's evidence to the effect that after the indictment attorneys, Robinson and Gwinn, represented him in making bond in the Federal court; that they filed motions for severance under said indictments, for permission to examine the notes of the Grand Jury and for dismissal of said indictment against each of the defendants. The evidence shows that these motions were sworn to before the clerk of the Federal Court by defendant, Steinberg, and were signed by both Robinson and Gwinn as attorneys. It is undisputed that these attorneys made the negotiations with the District Attorney at New Orleans for the final disposition of the case and that they stood up at the bar and entered the plea of nolo contendere for the defendant wherein the court fined him $500. So we find that the defendant, at least, accepted the services of attorneys Robinson and Gwinn and made no objection to the rendering of such services.

Defendant did testify that he never at any time employed Robinson and Gwinn as attorneys to represent him in the investigation of this criminal action or in the handling of the case in court. He said they were trying to make him the "goat" in the case and were only acting for Loeb and Plough; that these attorneys were trying to get him to sign a statement assuming full responsibility for the sale of cigarettes to Anguzza and exonerating defendants, Plough and Loeb; that he refused to sign the statement and employed his brother, Harry Steinberg, and a lawyer by the name of Walter Brown of El Dorado, Arkansas, to represent him. Under the conflicting testimony this court believes it proper to follow the findings of the trial court on the credibility of the witnesses. Pizzo v. Pizzo, 365 Mo. 1224, 295 S.W.2d 377, 385 [En Banc].

It is contended by defendant that there was a conflict of interest between defendants, Loeb and Plough, and defendant, Steinberg. To support this contention he cites Rochester v. Gonterman, Mo.Sup., 49 S.W.2d 71.

An examination of this case shows that the facts are so different as not to be an authority in the instant case. In the instant case the record is clear from defendant's testimony that there was no conflict of interest. We think there is no merit to this contention.

The test of inconsistency is stated in Hoffman v. Hogan, 345 Mo. 903, 137 S.W. 2d 441, 446 [13] as follows:

" 'The test of inconsistency is not whether the attorney has ever appeared for the party against whom he now proposes to appear, but it is whether his accepting the new retainer will require him, in forwarding the interests of his new client, to do anything which will injuriously affect his former client in any matter in which he formerly represented him, and also whether he will be called upon, in his new relation, to use against his former client any

knowledge or information acquired through their former connection.'"

In the instant case both Gwinn and Robinson, who were in possession of all of the facts, testified there was no conflict of interest. The conspiracy mail fraud case was based solely upon transactions, correspondence, and personal relations between Anguzza and defendant, Steinberg, about which Loeb and Plough knew nothing. The charge was conspiracy. If Steinberg could be cleared the other two defendants could be cleared as a matter of course. If Steinberg should be convicted, then Loeb and Plough should also be convicted by reason of their ownership of the Steele Sales Company. We can see no proof of a conflict of interest.

In In re Pfiffner's Guardianship, Mo. App., 194 S.W.2d 233, 236 [3, 4], Judge Bennick, speaking for the court stated:

"There is nothing better settled than that a lawyer may not lawfully represent interests which are conflicting in the sense that it would be his duty, on behalf of one client, to contend for that which his duty to another client would require him to oppose. Rule 4.06 of the Supreme Court of Missouri [42 V.A.M.S.]; Moffett Bros. Partnership Estate v. Moffett, 345 Mo. 741, 137 S.W.2d 507; Hoffman v. Hogan, 345 Mo. 903, 137 S.W.2d 441; * * *" In re Schield's Estate, Mo.Sup., 250 S.W.2d 151, 158 [13].

Under the law and facts in this case we must find that there is no merit in the contention that here was a conflict of interest so as to prevent Robinson and Gwinn from representing defendant, Loeb and Plough in the criminal action in Federal Court.

It is contended by defendant that plaintiff tried the case on the theory of off-set, that attorneys Robinson and Gwinn, so far as the defendant was concerned, were entitled to a reasonable fee.

In the court's memorandum opinion he states: "The evidence is and the Court further finds that Steinberg, Loeb and Plough retained and employed Robinson and Gwinn to represent all three of them in the Louisiana case and agreed to pay said attorneys a reasonable fee and expenses and that the same would be paid by the Steele Sales Company, Loeb, Plough and Steinberg."

We think the finding of the court was justified under the evidence.

Defendant contends that assuming that Robinson and Gwinn would be entitled to a reasonable fee from the defendants that the allowance of $15,000 attorney fee was erroneous; because exorbitant, excessive and unreasonable; that it was based upon incompetent evidence in arriving at such fee.

█ We agree with defendant that this court, if it finds the fee excessive, is empowered and authorized to fix such fee.

In Sluggett v. Phillips, Mo.App., 178 S.W.2d 458, cited by defendant, the rule of law is stated on page 462 [2–4]:

"* * * We recognize the rule that the testimony of a lawyer as to the value of legal services is not necessarily binding on the courts. Such testimony is advisory and helpful but not ordinarily essential. The court, when fully advised as to the essential facts, may fix the value without the aid of expert testimony. The rule applies to the trial court and the appellate court as well. Sheehan v. Gillespie, Mo.App., 167 S.W.2d 372; Robertson v. Manufacturing Lumbermen's Underwriters, 346 Mo. 1103, 145 S.W.2d 134; Bucknam v. Bucknam, 347 Mo. 1039, 151 S.W.2d 1097. * * *"

█ In the instant case the court was fully advised of the facts governing the attorney fees. The lawyers testified that this was a case of first impression. It was a conspiracy case to defraud through the U. S. Mail in three counts. The maximum punishment for each count being five years in the penitentiary. The testimony is that these lawyers spent months examining the law touching fraud cases, made numerous

briefs for the trial of said cause, made trips from Memphis to Steele, Missouri, and, in the handling of the case, to New Orleans and paid all their expenses. In fact, the evidence shows a tremendous amount of work, travel and expenses connected with the criminal action and, under the circumstances, this court would not be justified in holding the fee excessive. However, we agree with the trial court that the amount of the fee actually paid by the defendant was hardly more than half of the fee paid by Loeb and Plough, therefore, we find against defendant under this assignment of error.

We think there was sufficient evidence in the record to justify the trial court in finding that the defendant, together with Loeb and Plough agreed that the fee should be paid by the Steele Sales Company. It is conceded by the defendant that the fine and costs paid by Loeb and Plough by checks drawn on the Steele Sales Company was a proper item to be deducted from the net profits. Likewise, we can see no reason why attorney fees paid by Loeb and Plough for the defendant should not be a proper item to deduct from the earnings of said company and we find that such an off-set, if the same was an off-set, was proper.

Judgment affirmed.

STONE, P. J., and RUARK, J., concur.